[No. H030767. Sixth Dist. Feb. 6, 2008.]

LISA KRINSKY, Plaintiff and Respondent, v.
DOE 6, Defendant and Appellant.

## COUNSEL

The Hoyle Law Firm, Arlene Fickler and Lawrence T. Hoyle, Jr.; Steefel, Levitt & Weiss, Barry W. Lee and Amy B. Briggs for Defendant and Appellant.

DeSimone & Huxster, Gerry DeSimone; and Robert Wayne Pearce for Plaintiff and Respondent.

## OPINION

**ELIA, J.**—As Internet technology has evolved over the past two decades, computer users have encountered a proliferation of chat rooms and Web sites that allow them to share their views on myriad topics from consumer products to international diplomacy. Internet bulletin boards, or "message boards," have the advantage of allowing users, or "posters," to express themselves anonymously, by using "screen names" traceable only through the hosts of the sites or their Internet service providers (ISP's). One popular forum is the financial message board, which offers posters the opportunity to communicate with others concerning stock trading, corporate behavior, and other finance-related issues.

The conversation on one financial message board devolved into scathing verbal attacks on the corporate officers of a Florida company, prompting a lawsuit by one of those officers, plaintiff Lisa Krinsky. Plaintiff attempted to discover the identity of 10 of the pseudonymous posters by serving a subpoena on the message board host, Yahoo! Inc. (Yahoo!). Defendant "Doe

6" moved to quash the subpoena, but the trial court denied the motion. Doe 6 appeals, contending that he had a First Amendment right to speak anonymously on the Internet. Under the circumstances presented, we agree with Doe 6 that his identity should be protected and therefore reverse the order.

*Procedural History*

Until December 31, 2005, plaintiff was the president, chair of the board, and chief operating officer of SFBC International, Inc., a publicly traded "global development drug service company" with offices in Florida. In January 2006 plaintiff sued 10 "Doe" defendants in a Florida court. In the action plaintiff alleged that defendants had made "defamatory remarks" about her on Yahoo! message boards and other Web sites, using screen names to conceal their identities. During the litigation defendant Doe 6 was often referred to as "Senor_Pinche_Wey," the screen name he had used in posting on the Yahoo! Finance message board.[1]

Seeking damages and an injunction, plaintiff asserted two causes of action in the Florida complaint. All 10 defendants were accused of intentional interference with a "contractual and/or business employment relationship" between plaintiff and SFBC. Nine of the defendants were accused together of libel based on false and misleading Internet statements imputing dishonesty, fraud, improper professional conduct, and criminal activity to plaintiff.

The record contains copies of the alleged defamatory messages posted on the Yahoo! message board devoted to SFBC. Most of the posts derided another SFBC executive, "Jerry 'Lew' Seifer."[2] Doe 6 called Seifer a "mega scum bag" and a "cockroach" and suggested that there were more "cockroach" executives at the company after Seifer resigned. In one message, posted on December 18, 2005, Doe 6 purported to find it "funny and rather sad that the losers who post here are supporting a management consisting of boobs, losers and crooks. (Krinsky, Natan and Seifer) while criticizing a charitable and successful hedge fund manager, who, unlike his critics and the longs here, has done his homework." In a December 30, 2005 post, Doe 6 offered his so-called "Jerry 'Lew' Seifer's New Year's resolutions." The list included the following statement: "I will reciprocate felatoin [*sic*] with Lisa even though she has fat thighs, a fake medical degree, 'queefs' and has poor feminine hygiene."[3]

---

[1] For ease of reference we will use masculine pronouns to refer to Doe 6, as did his attorney in the proceedings below.

[2] Seifer was a vice-president of legal affairs at SFBC, who apparently resigned in mid-December 2005.

[3] At the hearing on Doe 6's motion to quash, his attorney and the court assumed that "felatoin" was a misspelling of the word "fellatio."

In order to serve the proper defendants, Krinsky served a subpoena on the custodian of records at Yahoo! in Sunnyvale, California. Yahoo! notified Doe 6 that it would comply with the subpoena in 15 days unless a motion to quash or other legal objection was filed. Doe 6 then moved in superior court to quash the subpoena on the grounds that (1) plaintiff had failed to state a claim sufficient to overcome his First Amendment rights for either defamation or interference with a contractual or business relationship, and (2) plaintiff's request for injunctive relief was an invalid prior restraint.

At the April 28, 2006 hearing on the motion, the superior court suggested that Doe 6 was "trying to drive down the price of [plaintiff's] company to manipulate the stock price, sell it short and so forth." The court queried whether it was "protected speech to do that? To deliberately engage in tactics designed to circumvent securities laws to drive the price down to a publicly traded company?" The court also expressed the view that "[a]ccusing a woman of unchastity" and "calling somebody a crook . . . saying that they have a fake medical degree, accusing someone of a criminal act, accusing someone—impinging [*sic*] their integrity to practice in their chosen profession historically have been libel per se." Counsel for Doe 6 maintained, however, that the reference to "crook" was to Seifer, not plaintiff,[4] and that the use of this term was, *in context*, mere opinion and therefore protected by the First Amendment.

On July 6, 2006, the court requested additional briefing on two questions: whether *O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423 [44 Cal.Rptr.3d 72] applied to this case; and whether there was "any consideration of whether the actions of the defendants [had violated] any State or Federal securities laws." After receiving supplemental briefs from each party on these questions, the court denied the motion to quash. The court recognized the applicability of the First Amendment to speech on the Internet and summarized the holdings of several appellate courts addressing claims of free speech in the context of libel suits. The court did not decide, however, whether Doe 6's messages were protected speech. Instead, it looked to the issues it had posed to the parties and specifically found that Doe 6's conduct appeared to be similar to federal cases involving " 'pump and dump' stock manipulation" efforts. The court expressly adopted plaintiff's supplemental

---

[4] Addressing the slur "boobs, losers and crooks (Krinsky, Natan and Seifer)," counsel for Doe 6 argued that each of the labels was intended to attach to one of the three individual executives, in the same order; thus, "crook" was directed at only Seifer. Plaintiff's counsel, however, took the position that Doe 6 had been attributing all three labels to all three executives.

brief, concluding that "[t]he issues raised by this Court" and "the totality of the circumstances of this case justif[y] the relief Plaintiff is seeking [*sic*]."

*Discussion*

1. *Standard of Review*

The parties do not concur on the applicable standard of review. Doe 6 submits that we must evaluate his motion de novo, as the matter "involves the important constitutional right to speak anonymously." Plaintiff maintains that the order should be reviewed only for abuse of discretion.

This appeal arises from a discovery order, which normally is reviewed under the deferential abuse of discretion standard. (*John B. v. Superior Court* (2006) 38 Cal.4th 1177, 1186 [45 Cal.Rptr.3d 316, 137 P.3d 153]; *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 380 [15 Cal.Rptr. 90, 364 P.2d 266].) Accordingly, a reviewing court generally will not substitute its opinion for that of the trial court and will not set aside the trial court's decision unless "there was 'no legal justification' for the order granting or denying the discovery in question." (*Lipton v. Superior Court* (1996) 48 Cal.App.4th 1599, 1612 [56 Cal.Rptr.2d 341].) On the other hand, "while the trial court has wide discretion in managing discovery issues, 'there can be no room for the exercise of such discretion if no ground exists upon which it might operate.' [Citation.] Where, as here, the relevant facts are undisputed, we review a trial court's exercise of discretion as a question of law. [Citation.] An appellate court may reverse a trial court decision for abuse of discretion where the exercise of that discretion is not based upon the applicable law. 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' [Citation.]" (*Toshiba America Electronic Components v. Superior Court* (2004) 124 Cal.App.4th 762, 768 [21 Cal.Rptr.3d 532].)

Moreover, Doe 6 invokes the protection of the First Amendment in seeking reversal. We cannot ignore our highest court's admonition that when the appellate issue is whether a particular communication falls outside the protection of the First Amendment, independent review is called for, "both to be sure that the speech in question actually falls within the unprotected category and to confine the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 505 [80 L.Ed.2d 502, 104 S.Ct. 1949].) Thus, when called upon to draw " 'the line between speech unconditionally guaranteed and

speech [that] may legitimately be regulated,' " "we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' " (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285 [11 L.Ed.2d 686, 84 S.Ct. 710], quoting *Pennekamp v. Florida* (1946) 328 U.S. 331, 335 [90 L.Ed. 1295, 66 S.Ct. 1029]; see also *In re George T.* (2004) 33 Cal.4th 620, 632 [16 Cal.Rptr.3d 61, 93 P.3d 1007] [independent review of plausible First Amendment defense in determining whether communication constitutes a criminal threat].)[5] In all other respects, the abuse of discretion standard is appropriate. And to the limited extent that the court below resolved evidentiary disputes, made credibility determinations, or made findings of fact that are not relevant to the First Amendment issue, we uphold those rulings if they are supported by substantial evidence. (*In re George T.*, *supra*, 33 Cal.4th at p. 634.)

## 2. *The First Amendment and Speech on the Internet*

As noted earlier, ordinary people with access to the Internet can express their views to a wide audience through the forum of the online message board. The poster's message not only is transmitted instantly to other subscribers to the message board, but potentially is passed on to an expanding network of recipients, as readers may copy, forward, or print those messages to distribute to others. The use of a pseudonymous screen name offers a safe outlet for the user to experiment with novel ideas, express unorthodox political views, or criticize corporate or individual behavior without fear of intimidation or reprisal. In addition, by concealing speakers' identities, the online forum allows individuals of any economic, political, or social status to be heard without suppression or other intervention by the media or more powerful figures in the field.

Yet no one is truly anonymous on the Internet, even with the use of a pseudonym. Yahoo! warns users of its message boards that their identities can be traced, and that it will reveal their identifying information when legally compelled to do so.[6] Nevertheless, the relative anonymity afforded by the Internet forum promotes a looser, more relaxed communication style. Users

---

[5] "The independent review function is not equivalent to a '*de novo*' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff." (*Bose Corp. v. Consumers Union of U.S., Inc., supra*, 466 U.S. at p. 514, fn. 31.)

[6] In its Terms of Service, Yahoo! cautions that it "may access, preserve and disclose your account information and Content if required to do so by law or in a good faith belief that such access preservation or disclosure is reasonably necessary to: (a) comply with legal process; (b) enforce the TOS; (c) respond to claims that any Content violates the rights of third parties . . . ." (<http://info.yahoo.com/legal/us/yahoo/utos/utos-173.html> [as of Feb. 6, 2008].)

are able to engage freely in informal debate and criticism, leading many to substitute gossip for accurate reporting and often to adopt a provocative, even combative tone. As one commentator has observed, online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas: "Hyperbole and exaggeration are common, and 'venting' is at least as common as careful and considered argumentation. The fact that many Internet speakers employ online pseudonyms tends to heighten this sense that 'anything goes,' and some commentators have likened cyberspace to a frontier society free from the conventions and constraints that limit discourse in the real world." (Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace* (2000) 49 Duke L.J. 855, 863, fns. omitted.)

It is this informal ability to "sound off," often in harsh and unbridled invective, that opens the door to libel and other tortious conduct. In the corporate and financial arena, the targets of such "cybersmear" may suffer damage to their business reputations and a concomitant decline in company value as disinformation and rumors propagate rapidly over the Internet. In addition, as the level of rational and civil discourse deteriorates, it becomes increasingly difficult to find meaningful contribution in these online conversations. (Lidsky, *Silencing John Doe: Defamation & Discourse in Cyberspace*, *supra*, 49 Duke L.J. at p. 903.)

██ Judicial recognition of the constitutional right to publish anonymously is a long-standing tradition. Most of the early decisions affirming this right concern political speech or artistic endeavors. "Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind. Persecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all." (*Talley v. California* (1960) 362 U.S. 60, 64 [4 L.Ed.2d 559, 80 S.Ct. 536] [ruling unconstitutional ordinance barring without limitation distribution of handbills that lacked identification of persons preparing or sponsoring them].) "The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible. Whatever the motivation may be, at least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry. Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment."

*(McIntyre v. Ohio Elections Comm'n* (1995) 514 U.S. 334, 341–342 [131 L.Ed.2d 426, 115 S.Ct. 1511], fn. omitted; accord, *Watchtower Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton* (2002) 536 U.S. 150, 166 [153 L.Ed.2d 205, 122 S.Ct. 2080].)

When vigorous criticism descends into defamation, however, constitutional protection is no longer available. "[I]t is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *(Chaplinsky v. New Hampshire* (1942) 315 U.S. 568, 571–572 [86 L.Ed. 1031, 62 S.Ct. 766], fns. omitted; see also *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 245–246 [152 L.Ed.2d 403, 122 S.Ct. 1389] [freedom of speech "has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with real children . . ."]; *Beauharnais v. Illinois* (1952) 343 U.S. 250, 266 [96 L.Ed. 919, 72 S.Ct. 725] ["[l]ibelous utterances" are not constitutionally protected speech].)

■ Speech on the Internet is also accorded First Amendment protection. "Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer. . . . [O]ur cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." *(Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 870 [138 L.Ed.2d 874, 117 S.Ct. 2329].) As noted earlier, however, criticism on the Internet is often so recklessly communicated that the harm to its targets, particularly in the financial arena, may extend far beyond what is covered by rules applicable to oral rhetoric and pamphleteering.

■ Corporate and individual targets of these online aspersions may seek redress by filing suit against their unknown detractors. Once notified of a lawsuit by the Web site host or ISP, a defendant may then assert his or her First

Amendment right to speak anonymously through an application for a protective order or, as here, a motion to quash the subpoena. The present action for defamation and interference with business relationships is but one example of such confrontations.

### 3. *The Applicable Balancing Test*

The parties agree that the viability of the subpoena should be determined by weighing Doe 6's First Amendment right to speak anonymously against plaintiff's interest in discovering his identity in order to pursue her claim. They disagree, however, as to how that weighing process should be approached. Plaintiff urges application of three California decisions: *Mitchell v. Superior Court* (1984) 37 Cal.3d 268 [208 Cal.Rptr. 152, 690 P.2d 625], where the Supreme Court articulated five factors to consider in deciding whether a journalist may be compelled to disclose the identity of and information from confidential sources;[7] *O'Grady v. Superior Court, supra,* 139 Cal.App.4th 1423, which protected e-mail correspondence and its senders from disclosure in response to a civil subpoena; and *Rancho Publications v. Superior Court* (1999) 68 Cal.App.4th 1538 [81 Cal.Rptr.2d 274], where the court applied a qualified constitutional privilege protecting anonymous authors of advertisements criticizing the plaintiff hospital.

None of these cases is helpful to our analysis. *Mitchell,* for example, concerned a libel action in which the defendants, a newsmagazine and its reporters, resisted disclosing their confidential sources based on the "freedom of the press." (*Mitchell v. Superior Court, supra,* 37 Cal.3d at p. 274.) The Supreme Court held that the defendants had a qualified privilege to protect the identity of confidential sources. (*Id.* at p. 276.) Here we are not confronted with issues involving freedom of the press, the confidentiality of news sources, or the public confidence in media publications. The interrelated factors that define the scope of that privilege are of limited relevance here.

*Rancho Publications* is likewise not helpful. There the appellate court balanced the relevance of the material sought and the plaintiff's need for disclosure against the magnitude of the invasion of the critics' privacy. The

---

[7] These factors included (1) the nature of the litigation and the reporter's role in it, with disclosure being especially appropriate when a reporter is a defendant in a civil case, and particularly a libel action; (2) the importance of the information, which favors disclosure only if the information goes to " 'the heart of the plaintiff's claim' " (*Mitchell v. Superior Court, supra,* 37 Cal.3d at p. 280); (3) the extent to which the plaintiff has pursued alternative sources of the information; (4) the importance of protecting confidentiality in the case, considering the public importance of the matter and the risk of harm to the source; and (5) whether the plaintiff has made a prima facie showing that the challenged statement was false. With respect to the last factor, "[a] showing of falsity is not a prerequisite to discovery, but it may be essential to tip the balance in favor of discovery." (*Id.* at p. 283.)

court stressed the "particularized nature" of the qualified privilege it was applying. (*Rancho Publications v. Superior Court, supra*, 68 Cal.App.4th at p. 1550.) In an analysis that took into consideration the *Mitchell* factors, the court found that the newspaper that had published the critical advertisements had not itself been sued for defamation. Indeed, the hospital had supplied only "rank conjecture" that the "advertorials" were authored by the same source as the object of the preexisting defamation lawsuit. (*Id.* at p. 1551.) Furthermore, the hospital had not shown that the statements were false or beyond description as opinion.

In *O'Grady v. Superior Court, supra*, 139 Cal.App.4th 1423, Apple Computer, Inc. (Apple), sued a number of "Doe" defendants for misappropriation of trade secrets after they communicated information about a new Apple product that had not yet been released. O'Grady and another individual were the publishers of "online news magazine" Web sites on which they posted articles about the new product. (*Id.* at p. 1432.) The trial court permitted Apple to serve subpoenas on the host of one publisher's e-mail account and the other's Web site to produce documents relating to the identities of the defendants who had provided the information from which the articles were derived. The subpoenas further required the e-mail service hosts to produce all communications relating to Apple's new product. The trial court denied the publishers' motion for a protective order, but this court overturned the order by granting their petition for a writ of mandate. We held that the Stored Communications Act (SCA) prohibited disclosure of the information, with no exception for civil discovery. We further explained that the SCA "does not authorize the disclosure of the identity of the *author* of a stored message; it authorizes the disclosure of 'a record or other information pertaining to a *subscriber to or customer of such service* (not including the contents of communications) . . . .' (18 U.S.C. § 2703(c)(1), italics added.)" (*O'Grady, supra*, 139 Cal.App.4th at p. 1448.) *O'Grady* was not a case in which the subscriber himself had posted anonymous messages that were known; Apple sought the contents of private messages stored on the hosts' facilities. Such disclosure would have violated the SCA. Finally, we found that the petitioners were protected by article I, section 2, subdivision (b), of the California Constitution, the reporter's shield law (precluding judgments of contempt), and by the privilege enjoyed by a free press to safeguard the identity of confidential sources. Applying the *Mitchell* factors, we held that the circumstances favoring disclosure were outweighed by countervailing factors, particularly Apple's failure to exhaust alternative sources of the information.

This case is of the kind we distinguished in *O'Grady*. Plaintiff seeks only the identity of her detractor, not the content of a communication; and the protected interests asserted in the motion are not those of a third party host or news medium but those of the anonymous speaker himself. To reach a

workable standard by which to balance the parties' competing interests we must look beyond the reporters' shield law and the constitutional protections enjoyed by the news media. The proper focus instead should be on providing an injured party a means of redress without compromising the legitimate right of the Internet user to communicate freely with others.

### 4. Dendrite, Cahill, *and Other Tests*

Federal and state courts have made valiant efforts to devise a fair standard by which to balance the interests of the parties involved in disputes over Internet speech. The most deferential to plaintiffs are those applying a "good faith" standard. (See, e.g., *In re Subpoena to America Online, Inc.* (2000) 52 Va. Cir. 26, 37 [ISP required to disclose Doe identities upon corporate plaintiff's "legitimate, good faith basis" for alleging actionable conduct and the necessity of the information to advance the claim].) Plaintiff does not urge us to adopt such a low threshold for disclosure, nor would we do so; it offers no practical, reliable way to determine the plaintiff's good faith and leaves the speaker with little protection.

Other courts have exercised greater scrutiny of the plaintiff's cause of action before allowing the speaker to be identified. In *Dendrite Intern. v. Doe No. 3* (2001) 342 N.J. Super. 134 [775 A.2d 756], for example, a corporation alleged defamation by multiple Doe defendants on a Yahoo! message board and then sought expedited discovery in order to learn their identities. The New Jersey appellate court set forth a four-part test to ensure that plaintiffs do not use discovery to "harass, intimidate or silence critics in the public forum opportunities presented by the Internet." (*Id.*, 775 A.2d at p. 771.) First, the plaintiff must make an effort to notify the anonymous poster that he or she is the subject of a subpoena or application for a disclosure order, giving a reasonable time for the poster to file opposition. The plaintiff must also set forth the specific statements that are alleged to be actionable. Third, the plaintiff must produce sufficient evidence to state a prima facie cause of action. If this showing is made, then the final step should be undertaken: to balance the strength of that prima facie case against the defendant's First Amendment right to speak anonymously. (*Id.*, 775 A.2d at pp. 760–761.) In *Dendrite*, the appellate court affirmed the trial court's denial of the discovery application, as the corporate plaintiff had failed to produce evidence that any decline in its stock price had been caused by the offensive messages.[8]

---

[8] One commentator has questioned the *Dendrite* test, finding at least the third and fourth elements "troubling." (Vogel, *Unmasking "John Doe" Defendants: The Case Against Excessive Hand-Wringing over Legal Standards* (2004) 83 Or. L.Rev. 795, 808.) Without knowing the defendant's identity, a plaintiff may have difficulty determining whether it is financially worthwhile to pursue litigation. The author cited a Pennsylvania court that sympathized with the plaintiff's dilemma. "[P]laintiff needs to know the identity of the Doe

The same court on the same day followed *Dendrite* to a different result in *Immunomedics, Inc. v. Doe* (2001) 342 N.J. Super. 160 [775 A.2d 773, 777]. There the plaintiff company established a prima facie cause of action for breach of a confidentiality agreement by an employee suspected of revealing proprietary information on a Yahoo! finance message board. On this occasion the court did not analyze the harm asserted by Immunomedics. It also emphasized that the defendant would not be permitted to present evidence to disprove the plaintiff's claims, as that would afford the anonymous poster an unfair defense advantage. (*Id.*, 775 A.2d at p. 778.)

The third and fourth ingredients of the *Dendrite* analysis were later applied in *Highfields Capital Management, L.P. v. Doe* (N.D.Cal. 2005) 385 F.Supp.2d 969 (*Highfields Capital*). There the hedge fund management firm, which was the controlling shareholder of Silicon Graphics, Inc. (SGI), alleged that the Doe defendant had engaged in defamation, commercial disparagement, and violation of trademark and unfair competition laws through its three postings on a Yahoo! message board devoted to SGI. The district court ruled that the magistrate had properly required the plaintiff to present a " 'real evidentiary basis' " for believing the defendant had engaged in wrongful conduct causing harm to the plaintiff's interests. (*Id.* at p. 970.) The court adopted the test employed by the magistrate: (1) the plaintiff must adduce competent evidence to support a finding of each fact essential to the cause of action; and (2) *if* the first requirement is satisfied, the court must compare the magnitude of the harm to each party's interests that would result from a ruling in favor of either. (*Id.* at p. 976.) The magistrate found, and the district court agreed, that the plaintiff had not met the first component of the test, and it was therefore unnecessary to reach the second.

While Doe 6 urges us to follow *Highfields Capital,* plaintiff objects to that court's requirement of a prima facie showing of each element at the pleading stage. She nevertheless maintains that she met that test. Neither party advocates a third line of analysis set forth in *Doe v. Cahill* (Del. 2005) 884 A.2d 451, a case involving political speech about a public figure. In *Cahill* the Doe defendant was sued for defamation after criticizing a town councilman on an Internet blog. The trial court applied a "good faith" standard for disclosure and denied the defendant's request for a protective

---

defendants prior to incurring the expenses and other burdens of a trial, because it is questionable whether plaintiff would wish to proceed with a trial if John Doe turned out to be, for example, an inmate incarcerated pursuant to a trial before plaintiff. In this instance, it is unlikely that any judgment that she obtained would be satisfied." (*Melvin v. Doe* (2000) 49 Pa. D. & C.4th 449, 453, appeal quashed on other grounds (2001) 789 A.2d 696, revd. (2003) 575 Pa. 264 [836 A.2d 42]; see also *Klehr Harrison Harvey Branzburg & Ellers, LLP v. JPA Development, Inc.* (Pa.Com.Pl., Jan. 4, 2006, No. 0425) 2006 WL 37020 [agreeing with Vogel that the "rush to apply new standards" to a plaintiff's efforts to learn the identities of anonymous internet posters "should be slowed," as it "will likely do more harm than good"].)

order, but the Delaware Supreme Court reversed. The good faith standard, the high court held, was "too easily satisfied" to protect the First Amendment right to speak anonymously. (884 A.2d at p. 458.) Even a motion-to-dismiss standard was, in the court's view, too weak, because Delaware, as a notice-pleading state, required only "well-pleaded allegations" for a complaint to survive a motion to dismiss. (*Ibid.*) Consequently, any allegation that put the opposing party on notice of the claim was sufficient in that jurisdiction, even if it was " 'vague or lacking in detail.' " (*Ibid.*)

The *Dendrite* test, on the other hand, required too much. The *Cahill* court instead adopted a standard applicable to a plaintiff opposing summary judgment. Thus, the plaintiff "must support his defamation claim with facts sufficient to defeat a summary judgment motion."[9] (*Doe v. Cahill, supra*, 884 A.2d at p. 460.) The second *Dendrite* requirement, that the plaintiff set forth the exact statements alleged to be defamatory, was unnecessary because those statements must be quoted in the plaintiff's complaint to avoid summary judgment. The fourth *Dendrite* step, the balancing of the defendant's First Amendment rights against the strength of the plaintiff's case, was also unnecessary because "[t]he summary judgment test is itself the balance. The fourth requirement adds no protection above and beyond that of the summary judgment test and needlessly complicates the analysis." (884 A.2d at p. 461.) The court did, however, endorse the first element of the *Dendrite* test, that the plaintiff make reasonable efforts to notify the anonymous poster about the subpoena or request for a disclosure order and give the defendant a reasonable opportunity to respond. The *Cahill* court even required the plaintiff to publish that notice on the same message board where the allegedly defamatory statement appeared.

*Cahill* was followed by trial courts in various jurisdictions. (See, e.g., *Best Western Intern., Inc. v. Doe* (D. Ariz., July 25, 2006, No. CV-06-1537-PHX-DGC) 2006 WL 2091695 [agreeing with *Cahill* that a summary judgment standard should be satisfied]; *Reunion Industries, Inc. v. Doe 1* (Pa.Com.Pl. 2007) 80 Pa. D. & C.4th 449 [finding summary judgment standard "appropriate"]; but see *Klehr Harrison Harvey Branzburg & Ellers, LLP v. JPA Development, Inc., supra*, 2006 WL 37020 [agreeing with Vogel that existing procedural rules are sufficient without any new standards].) In *Lassa v. Rongstad* (2006) 2006 WI 105 [294 Wis.2d 187, 718 N.W.2d 673], however, the Wisconsin Supreme Court rejected the Delaware court's summary judgment standard in favor of a motion-to-dismiss standard. The " 'silly

---

[9] The court made an exception for the element of malice in a case involving a public figure, a showing that depends on whether the defendant had knowledge that his or her statement was false or made it with reckless disregard as to its truth. (See *New York Times Co. v. Sullivan, supra*, 376 U.S. at pp. 279–280.) As we do not decide whether plaintiff was a public figure, the question of whether she was obligated to produce evidence of malice is academic.

or trivial libel claims' " that would survive a motion to dismiss in a notice-pleading state such as Delaware would be adequately tested on a motion to dismiss in Wisconsin, where the statement constituting libel must be set forth in the complaint. (*Id.*, 718 N.W.2d at p. 687.) The majority opinion did not, however, explain how (or if) a motion to dismiss would incorporate a balancing of the parties' competing interests.

Other courts have utilized a motion-to-dismiss standard in weighing the need of injured parties to discover the identity of libelous Doe defendants against the rights of those defendants to speak anonymously. In *Rocker Mgmt. LLC v. John Does I Through 20* (N.D.Cal., May 29, 2003, No. MISC 03-003 3 CRB, 2003 U.S.Dist. Lexis 16277 [2003 WL 22149380]), on facts similar to those before us, the federal district court granted a motion to quash a subpoena on Yahoo!. The plaintiff could not satisfy the court that its complaint could withstand a motion to dismiss, as it could not show that any of the anonymous poster's statements constituted libel. In its ruling the district court relied on *Columbia Ins. Co. v. Seescandy.com* (N.D.Cal. 1999) 185 F.R.D. 573, 578–579, which articulated a four-part test, including a motion-to-dismiss evidentiary standard, for disclosure in an action for trademark infringement on the Internet.

We find it unnecessary and potentially confusing to attach a procedural label, whether summary judgment or motion to dismiss, to the showing required of a plaintiff seeking the identity of an anonymous speaker on the Internet. California subpoenas in Internet libel cases may relate to actions filed in other jurisdictions, which may have different standards governing pleading and motions; consequently, it could generate more confusion to define an obligation by referring to a particular motion procedure.[10] The specific *Dendrite* criteria to defeat a protective order or motion to quash may likewise be dependent on the different pleading and motion procedures across the states. For example, if a complaint is filed in a notice-pleading state in which defamation claims are not excepted by statute or case law, the second *Dendrite* requirement (setting forth the statement with particularity) will be

---

[10] For example, a motion to dismiss in federal court is functionally equivalent to a demurrer filed in California. (See *Laguna Village, Inc. v. Laborers' Internat. Union of North America* (1983) 35 Cal.3d 174, 182 [197 Cal.Rptr. 99, 672 P.2d 882].) A demurrer in this state is sustained when the facts asserted in the complaint fail to state a cause of action; the order is not based on the production of evidence, as it is assumed that the facts asserted in the complaint are true.

Indeed, the burden described by past courts can be compared to the showing required for a preliminary injunction. In such a case, the plaintiff must convince the court of the likelihood of prevailing on the merits, and the court must weigh the relative interim harm to the parties from the issuance or nonissuance of the injunction. (*Butt v. State of California* (1992) 4 Cal.4th 668, 677–678 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) Any comparison to procedural devices in these other contexts, however, is largely academic and, as we have noted, of questionable usefulness when considering actions initiated in other states.

essential, while in Wisconsin it will be superfluous, as the statement will already be set forth in the initial pleading.

We agree with the Delaware Supreme Court that the first requirement, an attempt to notify the defendant, does not appear to be unduly burdensome. (*Doe v. Cahill, supra*, 884 A.2d at p. 461.) We recognize, however, that an Internet Web site, chat room, or message board may no longer exist or be active by the time the plaintiff brings suit; consequently, it would be unrealistic and unprofitable to insist, as did the *Cahill* court, that a plaintiff "post a message notifying the anonymous defendant of the plaintiff's discovery request on the same message board where the allegedly defamatory statement was originally posted." (*Ibid.*)[11] Moreover, when ISP's and message board sponsors (such as Yahoo!) themselves notify the defendant that disclosure of his or her identity is sought, notification by the plaintiff should not be necessary. And in the procedural posture presented here, where the defendant is moving to quash the subpoena, the notification requirement benefits no one. Obviously Doe 6 has already learned of the subpoena or he would not be seeking protection.

Common to most courts considering the issue is the necessity that the plaintiff make a prima facie showing that a case for defamation exists.[12] Requiring at least that much ensures that the plaintiff is not merely seeking to harass or embarrass the speaker or stifle legitimate criticism.[13] Even the decisions imposing a motion-to-dismiss obligation nonetheless require " 'some showing' " that the tort took place. (See, e.g., *Rocker Mgmt. LLC v. John Does I Through 20, supra*, 2003 U.S.Dist. Lexis 16277 at p. *3, quoting *Columbia Ins. Co. v. Seescandy.com, supra*, 185 F.R.D. at p. 580 [likening the showing to probable cause in criminal investigations].)

Plaintiff objects to the requirement of a prima facie showing. She contends that it infringes a party's due process right because it does not include a reasonable opportunity to obtain evidence a plaintiff would need to establish a

---

[11] The posting requirement is also "more idealistic than practical; a wronged plaintiff is unlikely to want to keep a false assertion alive by inviting continued debate." (Siber & Marino, *Unmasking Online Defendants: Addressing the anonymous posting of rumors while preserving the First Amendment*, N.Y.L.J. (Apr. 9, 2007) p. S5 (Siber & Marino).)

[12] Vogel (see fn. 8, *ante*) has questioned the prima facie element altogether, pointing out that certain elements of a claim may be difficult to establish without knowing the defendant's identity. (See also Siber & Marino, N.Y.L.J., *supra*, at p. S5, suggesting that proof of actual malice toward a public figure "could be impossible.") Courts have obviated that difficulty, however, by insisting on a preliminary showing of only those facts accessible to the plaintiff. (See, e.g., *Doe v. Cahill, supra*, 884 A.2d at p. 464 [only facts pertaining to elements within plaintiff's control need be adduced].)

[13] For lawsuits brought in California and about half the other states, an anti-SLAPP (strategic lawsuit against public participation) statute (e.g., Code Civ. Proc., § 425.16) protects defendants from meritless actions arising from their exercise of the right of free speech.

prima facie case. She does not, however, explain why she would necessarily be deprived of such an opportunity in the context of a motion to quash. Nor does she complain that she actually was deprived of that opportunity; indeed, she maintains that she satisfied her burden to make a prima facie showing of libel. A plaintiff need produce evidence of only those material facts that are accessible to her. (See fn. 12, *ante.*) In an Internet libel case, that burden should not be insurmountable; here, for example, plaintiff knows the statement that was made and produced evidence of its falsity and the effect it had on her.

 We therefore agree with those courts that have compelled the plaintiff to make a prima facie showing of the elements of libel in order to overcome a defendant's motion to quash a subpoena seeking his or her identity. Where it is clear to the court that discovery of the defendant's identity is necessary to pursue the plaintiff's claim, the court may refuse to quash a third party subpoena if the plaintiff succeeds in setting forth evidence that a libelous statement has been made.[14] When there is a factual and legal basis for believing libel may have occurred, the writer's message will not be protected by the First Amendment. (Cf. *Beauharnais v. Illinois, supra,* 343 U.S. at p. 266 ["[l]ibelous utterances" are not constitutionally protected speech]; see also *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 485 [101 Cal.Rptr.2d 470, 12 P.3d 720] [First Amendment right to freedom of speech is not absolute]; *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [87 Cal.Rptr.2d 132, 980 P.2d 846] [same].) Accordingly, a further balancing of interests should not be necessary to overcome the defendant's constitutional right to speak anonymously.

In its order, the trial court in this case approached the question of plaintiff's prima facie showing of defamation, but it did not reach any clear conclusion on the matter.[15] Instead, after reviewing the law of defamation in the federal and Florida courts, the trial court presented the parties' arguments and

---

[14] "Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences. [Citation.]" (*Evans v. Paye* (1995) 32 Cal.App.4th 265, 280, fn. 13 [37 Cal.Rptr.2d 915]; accord, *Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1098 [79 Cal.Rptr.2d 597].)

[15] The court reviewed a number of prior decisions, including *Highfields Capital,* after which it stated, "Therefore, Plaintiff must establish a prima facie case of libel before revelation of an anonymous internet speaker." Doe 6 suggests that the court applied this test and "apparently" concluded that his statements did not constitute defamation. Plaintiff, on the other hand, maintains that the court "did not expressly adopt the Highfields Capital test . . . and . . . did not conclude that [she] failed to prove a prima facie case of defamation." With respect to the first point, the court did appear to accept the "prima facie" requirement. Plaintiff's second point, however, is well taken, as the court did not articulate any finding on whether plaintiff met her burden.

queried whether the "crooks" reference constituted libel. The court then suggested, "On the one hand, Senor_Pinche_Wey's other comments, calling Seifer a scum bag and cockroach, may reinforce the understanding that Senor_Pinche_Wey's references to Plaintiff were hyperbole and insults rather than assertions of literal fact." The next sentence, however, which began, "On the other hand," pertained to an entirely different question: whether this case was similar enough to federal "pump and dump" stock manipulation cases to "justif[y] the relief Plaintiff is seeking." The trial court incorporated plaintiff's supplemental brief in its ruling, thereby basing its ruling not on any showing related to the libel claim, but on plaintiff's argument regarding stock manipulation. Plaintiff's complaint included only two causes of action: intentional interference with a "contractual and/or business/employment relationship with SFBC" and defamation. In her supplemental brief she acknowledged that she had "not yet asserted claims relating to violations of State and/or Federal securities laws." We will refrain from ruling on the adequacy of a cause of action that was never pleaded.[16]

### 5. *Prima Facie Showing of Libel*

■ In examining the law of defamation, the court correctly determined that plaintiff's prima facie burden must be defined and satisfied according to Florida law. (Cf. *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 347 [41 L.Ed.2d 789, 94 S.Ct. 2997] [within constitutional limits, states may define for themselves law of liability for defamation].) ■ In Florida, as in California, defamation consists of an "unprivileged publication of false statements which naturally and proximately result in injury to another." (*Wolfson v. Kirk* (Fla.Dist.Ct.App. 1973) 273 So.2d 774, 776.) "In other words, such a communication is 'defamatory' if it tends to harm the reputation of another as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party." (*LRX, Inc. v. Horizon Assoc. Joint Venture* (Fla.Dist.Ct.App. 2003) 842 So.2d 881, 885.) A private plaintiff in a libel case must prove that the defendant published a false statement about the plaintiff to a third party and that the false statement caused injury to the plaintiff. (*Valencia v. Citibank Intern.*

---

[16] The only reference in the complaint to stock manipulation was in the description of the defendants: "On information and belief, the Defendants are short sellers of SFBC common stock, that is, traders who bet that the market price for SFBC common stock will decline for profit. The Defendants have been posting false, misleading, derogatory and defamatory messages on the Yahoo! message boards, the Silicon Investor message board, and the Kedrosky Blogs . . . to interfere with the contractual/business relationships between Ms. Krinsky and SFBC as an officer, director and shareholder of the company. By posting the defamatory messages on the Message Boards, the Defendants intend to cause stock market research analysts and SFBC's employees, consultants and investors to form a negative view of SFBC and Ms. Krinsky. The Defendants' goal is to depress the price of the stock for the short sellers' benefit, to harm Ms. Krinsky's business reputation and interfere with her contractual and business relationship with SFBC and other members of the business community."

(Fla.Dist.Ct.App. 1999) 728 So.2d 330; *Razner v. Wellington Medical Center, Inc.* (Fla.Dist.Ct.App. 2002) 837 So.2d 437, 442.)

■ Plaintiff contends that she demonstrated that Doe 6's posts were libelous per se. A publication is libelous per se in Florida "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession. [Citations.]" (*Richard v. Gray* (Fla. 1953) 62 So.2d 597, 598.)[17] Plaintiff maintains that Doe 6 implied that she was dishonest by calling her a "crook" and asserted that she had a "fake medical degree," thereby accusing plaintiff of being dishonest or at least of engaging in conduct incompatible with her employment. He also subjected her to ridicule and disgrace and damaged her reputation by stating that she had "poor feminine hygiene."

In determining whether a publication is libelous per se, the language used "will be given neither a mild nor [a] harsh construction" (*Adams v. News-Journal Corporation* (Fla. 1955) 84 So.2d 549, 551), but instead will be construed in the sense the speaker appears to have intended to convey it, and "as the common mind would naturally understand it." (*Richard v. Gray, supra*, 62 So.2d at p. 598.) In other words, the statement should be considered in its natural sense without a forced or strained construction. (*Byrd v. Hustler Magazine, Inc.* (Fla.Dist.Ct.App. 1983) 433 So.2d 593, 595.) The determination necessarily depends on the facts of the individual case, and the context of the communication must be examined. (*Adams v. News-Journal Corporation, supra*, 84 So.2d at p. 551; see also *Greenbelt Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 13 [26 L.Ed.2d 6, 90 S.Ct. 1537] ["blackmail," under the circumstances, was not slander when spoken or libel when reported]; *Seropian v. Forman* (Fla.Dist.Ct.App. 1995) 652 So.2d 490, 496 ["influence peddling," in context, was only rhetorical hyperbole].)

■ When a defamation action arises from debate or criticism that has become heated and caustic, as often occurs when speakers use Internet chat rooms or message boards, a key issue before the court is whether the statements constitute fact or opinion. In some cases, the communication may

---

[17] Libel per se has been more elaborately defined as " 'the false and unprivileged publication by letter, newspaper, or other form of writing, of unfounded statements or charges which expose a person to hatred, distrust, contempt, ridicule, or obloquy, or which tend to cause such person to be avoided, or which have a tendency to injure such person in his office, occupation, business, or employment, and which are such that in their natural and proximate consequence, will necessarily cause injury to the person concerned, in his personal, social, official, or business relations of life, so that legal injury may be presumed or implied from the bare fact of the publication itself. [Citations.]' " (*McCormick v. Miami Herald Publishing Company* (Fla.Dist.Ct.App. 1962) 139 So.2d 197, 200.)

amount to "mixed opinion." "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the [publication] or which are otherwise known or available to the reader or listener as a member of the public. Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." (*From v. Tallahassee Democrat, Inc.* (Fla.Dist.Ct.App. 1981) 400 So.2d 52, 57; *Stembridge v. Mintz* (Fla.Dist.Ct.App. 1995) 652 So.2d 444, 446.) " 'Rather, the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion.' " (*Della-Donna v. Yardley* (Fla.Dist.Ct.App. 1987) 512 So.2d 294, 296; *Town of Sewall's Point v. Rhodes* (Fla.Dist.Ct.App. 2003) 852 So.2d 949, 951; see also *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 18 [111 L.Ed.2d 1, 110 S.Ct. 2695] [rejecting artificial dichotomy between opinion and fact and cautioning that expressions of opinion may often imply an assertion of objective fact].) Only the latter category of expression may subject the communicator to liability. (*Barnes v. Horan* (Fla.Dist.Ct.App. 2002) 841 So.2d 472, 476.)

"In determining whether the statement is one of pure or mixed opinion, the court must examine the statement in its totality and the context in which it was uttered or published. The court must consider all of the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement and consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published." (*Hoch v. Rissman, Weisberg, Barrett* (Fla.Dist.Ct.App. 1999) 742 So.2d 451, 460; see *Stembridge v. Mintz, supra,* 652 So.2d at p. 447; *Rasmussen v. Collier County Pub. Co.* (Fla.Dist.Ct.App. 2006) 946 So.2d 567, 571.)

In this case, Doe 6's messages, viewed *in context*, cannot be interpreted as asserting or implying objective facts. During November and December 2005 many messages were posted on the Yahoo! finance "SFCC" message board[18] regarding the management and value of SFBC. Heated discussion focused on plaintiff's credentials and "credibility." Other messages questioned the reputed personal relationship between her and Seifer.

Those posts of Doe 6 that are alleged as libelous convey scorn and contempt. On December 15, 2005, Doe 6 called Seifer a "mega scum bag." The next day, reacting to Seifer's departure from SFBC, Doe 6 said, "Shorts

---

[18] SFBC stock was traded under the symbol "SFCC."

sing 'La Cucaracha, La Cucaracha' [¶] Where there is one cockroach, many more are there . . . Firing Seifer won't stop the meltdown." The sarcastic, derisive tone of these two derogatory posts is obvious, but neither one referred to plaintiff by name or by title. Likewise, a December 20 post titled "Seifer..........OUT!" said only, "That is one cockroach gone....how many left? [¶] Ole!" Even if we assume that readers understood "many more are there" and "how many [are] left" to target plaintiff, calling her a cockroach obviously cannot be interpreted as a statement of actual fact.

On December 18, 2005, in a post titled "State of denial," Doe 6 criticized in crude, ungrammatical language the "idiot longs" who had supported the management of SFBC: "[F]unny and rather sad that the losers who post here are supporting a management consisting of boobs, losers and crooks. (Krinsky, Natan and Seifer) while criticizing a charitable and successful hedge fund manager, who, unlike his critics and the longs here, has done his homework. [¶] How many of the idiot longs here did their work and said to themselves, 'I know Natan had been CFO of at least 3 bankrupt companies and I know Seifer filed for personal bankruptcy and roughed up some patients, shares a rolls royce and a bently [*sic*] with the President and a $15mm [*sic*] mansion, but what the hey, the numbers look good and it has been a long time.' [¶] No, Loeb earned his $$$ and those of you who are whimpering on eachother's [*sic*] shoulders crying to be saved by Spizer, the SEC etc are a bunch of pathetic losers . . . . But we already knew that, you were long SFCC. [¶] Ole!" A reasonable reader of this diatribe would not comprehend the harsh language and belligerent tone as anything more than an irrational, vituperative expression of contempt for the three officers of SFBC and their supporters. It appears to label each of the executives in the order named (with "boobs" referring to plaintiff); but even if each epithet refers to all three, this juvenile name-calling cannot reasonably be read as stating actual facts.

Finally, on December 30, 2005, Doe 6 posted the last of the messages plaintiff charged as defamatory. This one clearly was satirical in nature; it listed fictional "Jerry 'Lew' Seifer's New Year's resolutions" which alluded to troubles Seifer had recently encountered as an officer at SFBC.[19] Of these so-called resolutions, the only statement pertaining to plaintiff was, "I will reciprocate felatoin [*sic*] with Lisa even though she has fat thighs, a fake

---

[19] According to articles published by Bloomberg News, The Miami Herald, and other media sources, Seifer was vice-president of legal affairs but was not a lawyer. They also reported that Seifer jointly owned a $15 million home and a Rolls Royce with plaintiff, that he had encountered "regulatory problems" in the past, and that he had threatened drug trial participants with deportation if they did not sign statements refuting an earlier news report of deaths and injuries from SFBC drug testing. A Bloomberg.com news entry reported that Seifer resigned on December 19, 2005, following an investigation of his conduct with drug trial subjects.

medical degree, 'queefs' and has poor feminine hygiene."[20] The language is unquestionably vulgar and insulting, but nothing in this post suggested that the author was imparting knowledge of actual facts to the reader. The reference to a "fake medical degree" was only the latest entry in a protracted online debate about whether plaintiff's medical degree from Spartan Health Sciences University in the West Indies justified her use of the "M.D." title in company documents. No reasonable reader would have taken this post seriously; it obviously was intended as a means of ridiculing Seifer and plaintiff.

The federal district court in *Highfields Capital, supra*, 385 F.Supp.2d 969 confronted a similar scenario in granting a motion to quash. Examining the numerous posts on a Yahoo! message board, the magistrate had noted that "[m]any of the messages are crude, indecent, or transparently laughable—and many appear to have nothing whatsoever to do with SGI. Many of the postings include misspellings, grammatical errors, and/or incomplete thoughts and sentences. . . . Messages on this board reflect considerable venting, much tongue-in-cheek, little pretense at sophistication or thoughtfulness, and an ample and obvious sense of irreverence." (*Id.* at p. 973, fn. omitted.) Thus, the magistrate found, "[v]iewed in context (the only relevant way to view communications), defendant's postings consist of sardonic commentary on a public corporation; through irony and parody, these bulletin board postings express dissatisfaction with the performance of the stock and the way company executives choose to spend company resources." (*Id.* at p. 975.) The district court adopted the magistrate's conclusion that plaintiff firm had "failed to demonstrate that a reasonable person perusing the message board at issue would understand the statements as having been made by plaintiff itself, which is plaintiff's theory in support of its defamation and commercial disparagement claims." (*Id.* at p. 971; see also *Rocker Mgmt. LLC v. John Does I Through 20, supra*, 2003 U.S.Dist. Lexis 16277 at pp. *5–*6 [vulgar, hyperbolic chat room messages replete with grammar and spelling errors convey statements of opinion].)

■ We likewise conclude that the language of Doe 6's posts, together with the surrounding circumstances—including the recent public attention to SFBC's practices and the entire "SFCC" message board discussion over a

---

[20] The other statements were as follows: "I will not intimidate poor defenseless immigrants [¶] I will not commit fraud [¶] I will nor [*sic*] run afoul [of] SEC, CBOT or FCC regulattions [*sic*] [¶] I will remember to put the top down on the Rolls Royce when it rains in Miami [¶] I will not trade on inside information gleened [*sic*] from clinical trials. [¶] I will not worship the devil. [¶] I will not purchase mansions from former fraudsters who ran crooked 'vitamin' companies (R[e]xall Sundown) . . . [¶] I will not rip people off through crooked sales schemes on television. [¶] I will not go banrupt [*sic*] when I can't pay for my mortgage. [¶] Ole!"

two-month period—compels the conclusion that the statements of which plaintiff complains are not actionable. Rather, they fall into the category of crude, satirical hyperbole which, while reflecting the immaturity of the speaker, constitute protected opinion under the First Amendment. It hardly need be said that this conclusion should not be interpreted to condone Doe 6's rude and childish posts; indeed, his intemperate, insulting, and often disgusting remarks understandably offended plaintiff and possibly many other readers. Nevertheless, " ' "the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." ' [Citations.]" (*Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.* (1991) 502 U.S. 105, 118 [116 L.Ed.2d 476, 112 S.Ct. 501].)

## 6. *Interference with Contractual/Business Relationships*

 The next question is whether the cause of action for intentional interference with a contractual or business relationship remains viable, thereby precluding an order quashing the subpoena. Establishing intentional interference with a business relationship in Florida requires proof of "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." (*Tamiami Trail Tours, Inc. v. Cotton* (Fla. 1985) 463 So.2d 1126, 1127; accord, *Telemundo Network Group v. Azteca Intern.* (Fla.Dist.Ct.App. 2007) 957 So.2d 705, 710.)

 Doe 6 contends that the applicability of the First Amendment to his speech on the message board forecloses plaintiff's claim. We agree. Our Supreme Court, addressing both logical and pragmatic concerns, held that the limitations of the First Amendment "must be broadly applicable whenever the gravamen of the claim is injurious falsehood." (*Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1045 [232 Cal.Rptr. 542, 728 P.2d 1177].) Applying that conclusion to the plaintiff's claims of intentional interference with prospective economic advantage, unfair competition, and related torts, the Supreme Court found that the plaintiff could not satisfy First Amendment requirements, and the trial court therefore had properly sustained the media defendant's demurrer. (See also *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.* (C.D.Cal. 1998) 12 F.Supp.2d 1035, 1045 [following *Blatty*]; *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1543–1544 [1 Cal.Rptr.2d 514] [*Blatty* not limited to freedom of the press]; cf. *Hustler Magazine v. Falwell* (1988) 485 U.S. 46, 57 [99 L.Ed.2d 41, 108 S.Ct. 876] [intentional infliction of emotional distress fails when offending conduct protected by First Amendment].)

Here the complaint states background facts relating the specific "defamatory remarks" made by each defendant. Count 1 incorporates those allegations and adds the following: (1) plaintiff had a "contractual and/or business employment relationship" with SFBC; (2) defendants knew of the "contractual/business relationships" between plaintiff and SFBC; (3) defendants intentionally and unjustifiably interfered with those relationships; (4) plaintiff had suffered damages proximately caused by defendants' interference. As to Doe 6, it is clear from the pleading that the business tort alleged in the interference cause of action is based entirely on the "defamatory remarks" that were protected speech under the First Amendment. Casting the defamation claim in terms of interference with a business relationship does not save plaintiff's cause of action.

Plaintiff's reliance on several Florida decisions is misplaced. None addressed the question of whether an allegation of a business tort may withstand a demurrer or motion to quash when the underlying conduct is protected by the First Amendment. (See, e.g., *Linafelt v. Beverly Enterprises-Fl., Inc.* (Fla.Dist.Ct.App. 1999) 745 So.2d 386, 389–390 [finding sufficient evidence of interference with advantageous business relationship notwithstanding failure of defamation claim due to truth of statement]; *Salit v. Ruden, McClosky, Smith, Schuster* (Fla.Dist.Ct.App. 1999) 742 So.2d 381, 388–389 [causes of action adequately stated for defamation; plaintiffs entitled to re-plead injurious falsehood and interference with contract]; *Florida Fern Growers v. Concerned Citizens* (Fla.Dist.Ct.App. 1993) 616 So.2d 562, 570 [to accord defendants absolute immunity against legally sufficient claims based on improper petitioning activity would deny plaintiff access to the courts and give broader protection than Constitution guarantees]; *Londono v. Turkey Creek, Inc.* (Fla. 1992) 609 So.2d 14, 18–19 [facially sufficient claim that defendant homeowners abused conditional privilege subjected defendants to liability for business interference torts].)

We thus conclude that Doe 6's online messages, while unquestionably offensive and demeaning to plaintiff, did not constitute assertions of actual fact and therefore were not actionable under Florida's defamation law.[21] Because plaintiff stated no viable cause of action that overcame Doe 6's First Amendment right to speak anonymously, the subpoena to discover his identity should have been quashed.

---

[21] In light of this conclusion, it is unnecessary to address the parties' dispute over whether plaintiff was a public figure or, if she was, whether she would be required to adduce evidence of malice at this stage of the proceedings. (See *Doe v. Cahill, supra,* 884 A.2d at p. 464.)

*Disposition*

The order denying Doe 6's motion to quash the subpoena is reversed. The trial court is directed to enter a new order quashing the subpoena to the extent that it commands Yahoo! to disclose the identity of "Senor_Pinche_Wey." Doe 6 is entitled to his costs on appeal.

Rushing, P. J., and Premo, J., concurred.