Filed 6/10/15  In re S.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re S.W., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HUMAN AND HEALTH SERVICES AGENCY, | D067074 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3639) |
| v. | |
| S.M., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura

Birkmeyer, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Dana C. Shoffner, Senior Deputy County Counsel, for Plaintiff and

Respondent.

In this appeal, S.M. (Mother) challenges an order denying her petitions to modify dependency orders terminating services to reunify with her daughter, S.W. (Child), and placing Child with the caretaker with whom Child had been living for one and one-half years. Mother sought to modify the orders so that Child would be placed with Mother, or alternatively that Child would be placed with Mother's friend. Mother challenges the trial court's finding that she had not made a prima facie showing in support of modification, and accordingly argues the court erred by summarily denying her modification petitions without holding a full evidentiary hearing. We reject this contention and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

This dependency case arose from Mother's continued failure to end her relationship with her boyfriend (R.H.), who had engaged in numerous acts of domestic violence against Mother.[1] As we shall detail below, after a substantial period of reunification services and another incident of serious domestic violence, the court terminated reunification services. The court found that notwithstanding extensive therapeutic intervention, Mother was still caught in a cycle of domestic violence; she had not yet been able to end her relationship with R.H.; and Mother could not provide a safe home for Child.

A. *Detention and Jurisdiction*

On October 9, 2012, the child abuse hotline for the San Diego County Health and Human Services Agency (Agency) received a report of violence perpetrated by R.H. at

---

[1]     R.H. is not Child's father. Child's biological father is unknown.

the home of Child's maternal grandmother (Maternal Grandmother) where Mother and Child were residing. During this incident, R.H. threw an object through a bedroom window and then called Mother and threatened to kill her. Mother acknowledged the incident occurred. She reported that R.H. had engaged in other acts of domestic violence during their six-month relationship and had threatened to kill her on many occasions. In July 2012 he slapped her and spit on her; in August 2012 he took her to a secluded place where he punched her in the face and choked her until she lost consciousness; and on another occasion he had prostitutes beat her.

Mother explained R.H.'s violence started after he began to have juvenile court proceedings with the mother of one of his children; R.H. would "take his anger out on" Mother; and "one of the worst beatings she got" from R.H. was after one of his court hearings. She stated R.H. had "talked her into prostitution while they maintained an intimate relationship"; Mother was three months pregnant; and R.H. was the suspected father of her unborn child. Mother said she was afraid of R.H.; she did not know what he was capable of; and she did not know if he would have someone else hurt her.

Mother agreed to enter into a confidential domestic violence shelter, to have no contact with R.H., to obtain a restraining order against R.H., and to participate in a voluntary case with the Agency and sign a safety plan. On October 11, 2012, Mother signed a safety plan stating she would file a restraining order against R.H. by October 12, 2012. However, on October 26, 2012, Maternal Grandmother reported that Mother was still seeing R.H. and communicating with him, stating that on October 23 Mother sneaked out of Maternal Grandmother's home to see R.H. Mother denied this occurred.

3

On October 26, 2012, with the Agency's assistance, Mother moved to a confidential domestic violence shelter, where she participated in domestic violence groups and therapy sessions. On November 14, 2012, Mother told an Agency worker that she was not having contact with R.H. However, Mother later admitted to the social worker that on weekends R.H. would come and spend time with her and Child at the beach, and the Agency was concerned Mother disclosed the location of the confidential shelter to R.H., although she denied this. On December 9, 2012, Mother moved out of the domestic violence shelter two days before her time expired and she declined a placement in transitional housing and returned to Maternal Grandmother's home.

During a December 11, 2012 home visit, Mother told the Agency worker that she was not having any contact with R.H.; R.H. was " 'really sick' " and she understood the risk he posed to her and Child; and she had learned about the cycles of domestic violence while in the battered women's shelter. Mother declined to participate in services offered by the Agency, but agreed to inform the Agency worker of any potential changes in her living accommodations.

On January 11, 2013, the child abuse hotline received another referral alleging violence at Maternal Grandmother's home. When contacted, Mother stated she had not been at Maternal Grandmother's home since January 2, 2013. When the Agency worker went to speak with Mother at the home where she was staying, the worker discovered that Mother was staying at R.H.'s cousin's home, and R.H. was with Mother and Child. Because Mother had not separated herself and Child from R.H., that same day (January 11, 2013) the Agency removed Child from Mother's custody and placed her in a

4

confidential foster home. On January 15, 2013, the Agency filed a dependency petition alleging Mother had failed to protect Child (age 16 months).

In its detention report, the Agency stated that, contrary to her agreement, Mother had not filed a restraining order against R.H.; she had been dishonest about her ongoing contact with R.H.; and she was continuously putting herself and Child at risk. The Agency noted R.H. had an extensive criminal history, including a felony conviction for attempted murder; he has had multiple restraining orders against him; he was known to the Agency as "having extremely violent relationships with the women he pimps out as prostitutes"; and he was currently involved in a juvenile court case concerning his child and the child's mother for similar circumstances.

At a January 25, 2013 team decision meeting with the Agency, Mother at first denied contact with R.H. since Child's removal on January 11; however, she later admitted she had been interacting with R.H., explaining that when he was released from jail on or about January 22, he called her and said "a lot of nice things [she] wanted to hear," and she believed him and wanted to be with him and not be a single mother raising two children. During the team meeting, the persons in attendance (including members of Mother's family and Mother's friends) stated they believed Mother had never stopped interacting with R.H. and they expressed great concern for Mother's and Child's safety. By the conclusion of the meeting, Mother agreed not to have contact with R.H. and to participate in reunification services. In its February 2013 report, the Agency stated that it anticipated reunification as Mother progressed in services. In its February 11, 2013 jurisdictional ruling, the court adjudged Child to be a dependent of the court, ordered

5

liberal supervised visitation for Mother, and gave the Agency discretion to place Child with an approved relative or nonrelated extended family member. However, the court ordered no unsupervised visitation without court approval and information regarding Mother's progress in domestic violence treatment and an update as to whether there was a restraining order against R.H.

## B. *Six-month Review*

In February 2013, Mother began residing at a maternity shelter program, and in May 2013, she gave birth to her second child (Second Child).

In July 2013, the Agency reported that Mother had regular visitation with Child; she began weekly individual therapy in March 2013; and she started participating in a domestic violence group in May 2013. Mother's individual therapist reported Mother had "vowed to keep her children safe," stating she will stay away from R.H. for the sake of her children and she "is finished with her past life style that placed herself and her children at risk." Further, Mother had expressed an understanding of the high probability that R.H. will again be violent if he has not received treatment, of the damage she suffered as a child from witnessing domestic violence, and of the same pattern repeating in her life and that the cycle must stop with her for the sake of the children. Mother's group facilitator said she appeared to grasp some of the discussion topics; she seemed to be "slightly increasing her insight regarding power and control dynamics" she experienced with R.H.; and she was able to identify and examine some characteristics of an offender and relate that information to her relationship. Mother told the Agency worker that she had learned a lot about domestic violence cycles and now realized there

6

were cycles in her relationship with R.H.; she realized R.H. needed help but did not believe he would get it; and she knew they could not be together.

During this time, Mother claimed she had not interacted with R.H. However, the Agency discovered otherwise. The maternity shelter social worker reported that Mother was spending an increasing amount of time with R.H.'s family and appeared to have lost her motivation to participate in on-site services. The Agency worker received a phone call from Mother's friend who said Mother had been seeing R.H., and Mother was afraid to return to the shelter because R.H. had threatened to hurt her and he knew the location of the shelter. Jail records showed Mother had visited R.H. in jail on three occasions in April 2013.

In its July 2013 report, the Agency stated notwithstanding Mother's progress and participation in services, she had continuously disregarded her safety plan and interacted with R.H. and exposed Child to him; she would claim that she does not interact with R.H. but then admit to the contrary after being confronted with evidence; and because of Mother's continued contact with R.H., Child needed to remain in foster care. The Agency recommended that Mother continue with visitation and reunification services.

On August 5, 2013, Mother told the Agency worker that she wanted to move from the maternity shelter residence to live with R.H.'s mother. The Agency worker told Mother this was not appropriate because R.H. would have access to Mother and Second Child if and when R.H. was released from jail and Mother would not be able to reunite

7

with Child.[2]  On August 22, 2013, the maternity shelter gave Mother notice that she had to leave the shelter because, contrary to her agreements at intake, she had interacted with and disclosed shelter locations to R.H. and/or his relatives, had failed to file a restraining order against R.H., was spending four nights per week at the home of R.H.'s mother, and showed little or no desire to participate in services.

Meanwhile, on March 16, 2013, Child was placed with a nonrelated extended family member (M.J.).  However, after about one month she was removed from this home at M.J.'s request because of "communication differences" between Mother and M.J. Child was returned to her initial foster placement for 10 days, and on April 28, 2013—when Child was one year, eight months old—she was placed in the foster home of E.W. E.W. stated Child had adjusted well and was exhibiting no signs of emotional distress.

In a September 9, 2013 order, the court found Child would be at risk if returned to Mother at this time; Mother had made some progress with her case plan and it was expected she would reunite with Child by the 12-month review date; and sibling visitation between Child and Second Child should occur provided R.H. was not present.

C.  *12-Month Review and Termination of Reunification Services*

On January 22, 2014, the Agency recommended that Mother continue to receive services to the 18-month date.  The Agency reported Mother had custody of Second

---

[2]     On May 1, 2013, R.H. was extradited to North Carolina where he was being held on charges of assault, strangulation and kidnapping, and the Agency was told he might be released by the North Carolina authorities because the witness was not cooperating.  The North Carolina authorities thereafter informed the Agency that R.H. would be released from custody on September 4, 2013.

Child and was living with a friend; Mother claimed she had not had contact with R.H. for "a long time"; and Mother's roommate confirmed that R.H. had not been to their residence. Mother was continuing to participate in her domestic violence group and individual therapy, and Mother told the Agency worker that she "has learned things such as red flags that can lead to an abusive relationship."[3] The domestic violence group facilitator reported that Mother had been attending the group regularly, was speaking out more, and was making good progress. Mother continued to visit with Child, and although there were some problems with cancellations and tardiness, Child's caretaker reported the visits went well, Mother was very engaging with Child, and Child really enjoyed seeing Mother.

The Agency stated it would be detrimental to return Child to Mother at this time, and Mother needed to continue her domestic violence treatment so she could have a better understanding of the risks of continuing to associate with R.H. At a hearing on February 3, 2014, the court granted Mother short, unsupervised visitation with Child under strict conditions, including that Mother not allow Child to have any contact with R.H. and Mother immediately inform the Agency if R.H. tried to contact her.

On February 26, 2014, Mother completed her domestic violence victims group program. The case was scheduled for a 12-month review hearing on March 26, 2014,

---

[3] Mother was allowed to take a few weeks off therapy after Second Child's birth in May 2013, and she resumed therapy with a different therapist on December 19, 2013. The therapist said Mother had been consistently attending her weekly session but did not submit a report because therapy had only recently started.

with a pretrial conference set for March 4. At the March 4 pretrial hearing, Mother stated she would be requesting that Child be returned to her.

1. *March 17, 2014 Domestic Violence Incident*

The case changed dramatically, causing the Agency to recommend termination of reunification services, when there was another incident of domestic violence on March 17, 2014.

The Agency reported that in early March 2014, Mother moved into her own apartment. On March 17, 2014, while at this apartment, R.H. punched Mother several times in the face, slammed her against the wall, and choked her to the point of losing consciousness. When Mother regained consciousness, R.M. was kicking her in the legs. Mother escaped out a window and called 911. Because of this incident, Second Child was removed from Mother's custody, a dependency case was commenced for Second Child, and on March 20, 2014, Second Child was placed in the same foster home as Child.

Although Mother had visible bruises on her face and several witnesses said Mother was hurt and reported that her boyfriend had choked her, Mother later denied the March 17 assault occurred. She claimed she did not want R.H. at her apartment and she told the police that she was assaulted so they would come sooner and because this was the only way she knew to get R.H. to leave. Mother claimed she had no contact with R.H. before March 17. However, the property managers at Mother's apartment reported that a male fitting R.H.'s description frequented Mother's apartment and Mother told them that she was "working on her relationship with her boyfriend."

10

The Agency assessed Mother had failed to comply with her agreements not to have contact with R.H. and to notify the Agency if R.H. attempted to contact her, and Mother put herself and her children in danger by continuing to keep in contact with R.H. On April 15, 2014, the Agency recommended that Mother's services be terminated and that a Welfare and Institutions Code section 366.26 permanency planning hearing be set.[4] On May 22, 2014, Child's foster parent was granted de facto parent status.

2. *Termination of Reunification Services*

At a rescheduled 12-month review hearing held on May 27, 2014, the Agency stated Child had been in the system for one year, four months, and the May 17, 2014 domestic violence incident put Mother "back to square one with respect to her services" and reflected that she was not willing or able to separate herself from R.H. notwithstanding all the services she had received. The Agency noted that according to information in the police report, R.H. had not "barged" into her home and attacked her, but rather had come over to visit, she let him into the apartment, and the attack occurred when they were arguing about him seeing other women.

Mother's counsel noted that Mother currently had a restraining order against R.H., and asked for six months of additional services so she could prove to the Agency that she could provide a safe place for Child. Maternal Grandmother testified at the hearing that if Mother was given six more months of services, she would assist her if Mother stayed away from R.H.

---

[4] Subsequent statutory references are to the Welfare and Institutions Code.

11

When making its ruling terminating reunification services, the court recognized that it was very hard for a domestic violence victim "to leave the clutches of an abuser" and it often "takes multiple times to leave"; however, the court also recognized that exposure to domestic violence has "long-lasting consequences" on children. The court stated that although Mother had made some progress in services and had positive visitations with Child, she allowed R.H. back into her life notwithstanding an extended reunification period and multiple opportunities to separate from R.H., and she had not been truthful about the fact she was reestablishing her relationship with R.H. The court noted that the most recent domestic violence did not occur when R.H. "hunted [Mother] down" and then abused her, but rather occurred after she "clearly invited" him back and then, as he had done before, he "went crazy" on her during a dispute. The court concluded Mother had "a long ways to go and . . . has significant work to do before she's able to internalize what has been explained and what has been offered," and she was "still caught in a very significant domestic violence cycle" in which she continued "cycling back to" R.H.

The court found Mother could not at this time provide a safe home for Child; there was a substantial risk of detriment if Child was returned to Mother's custody; and there was no substantial probability Child would be returned to Mother by the 18-month date. The court ordered that Child remain in foster placement and that reunification services be terminated. The court set a section 366.26 permanency planning hearing for September 22, 2014.

D. *Denial of Mother's Requests for Modification*

*and Order Terminating Parental Rights*

On September 8, 2014, the Agency recommended that Mother's parental rights be terminated and that Child's permanent plan be adoption. The Agency reported that during supervised visits in August, September, and October 2014, Child treated Mother like a familiar adult or extended family member who Child was comfortable playing with, but there was no parent-child bond between Child and Mother, and Child looked to her caretaker as her sole maternal figure and primary source of love and comfort. For example, Child called her caregiver " 'Mommy' " and hugged and held on to her. While playing with toys, Child intermittently approached her caregiver to ask for hugs; when the caretaker left the room Child asked " 'Where's mommy?' "; and when the caretaker returned Child ran to her for a hug. During a visit in August, Child declined to sit on Mother's lap and ignored Mother's attempts to talk to her. During a visit in September, Child appeared "more sociable" with Mother and sat on Mother's lap while reading a story; however, Child chose to lie on the floor when she was tired and declined Mother's invitation to lie with her. During this September visit Child asked " 'Where did mommy go?' "; Mother responded " 'What do you mean? I'm your mommy . . . you look just like me!"; and Child said, "No not you, I want my mommy E . . . ! Why did she leave?' " During another September visit, when the caretaker left the room, Child said to Mother, " 'I want my mommy! You're not my mommy[—]I want mommy E . . . .' " During these visits, Child had no adverse reaction when separating from Mother and "happily waved goodbye" when leaving with the caretaker.

1. *Mother's Modification Motions*

Due to a change in Mother's counsel, the permanency planning hearing was rescheduled for November 18, 2014. On November 4, 2014, Mother filed two modification motions.

In her first modification motion, Mother asked the court to change its May 27, 2014 order terminating her reunification services and to instead order that Child be placed in her care. As a changed circumstance, Mother stated she started attending a domestic violence group on May 30, 2014; she started individual therapy (with a new therapist) on July 18, 2014; and R.H. had been convicted of domestic violence and sentenced to four to eight years in prison. Mother claimed she had resolved the safety issues that brought Child into dependency and it would be in Child's best interest to be raised by her biological mother if Mother can properly ensure her safety.

In support of her motion, Mother submitted reports from the facilitator of her domestic violence group and her individual therapist. The group facilitator stated Mother had attended 18 out of 22 group sessions, and her projected completion date was November 21, 2014. The facilitator reported that Mother seemed to hold R.H. accountable for his actions and to take responsibility for her action of not protecting her children when she allowed R.H. back into her home, and Mother's understanding of the cycle of abuse seemed to have increased. In a report dated October 3, 2014, the facilitator commented that as Mother "enhances her knowledge" of the consequences of domestic violence on children, she will "likely be better able to protect herself and her children from additional domestic violence dynamics."

14

In a report dated October 10, 2014, Mother's individual therapist stated she had attended 11 sessions and missed one, and classified Mother's various treatment goals as "In Progress." The therapist reported Mother was able to describe her previous process of viewing her relationship as primary rather than viewing her children and their safety as primary; Mother and the therapist had discussed ideas related to children needing a violence-free home more than a complete family unit; Mother appeared to have taken responsibility for the removal of her children due to her nonprotection; she had gained insight into the "red flags" within her relationship and the factors that led her into a domestic violence relationship and influenced her to stay; and she appeared "open to processing her [domestic violence] experiences" and to "work on her [domestic violence] related treatment goals."

If the court declined her first motion that Child be placed in her care, Mother requested in her second motion that the court change its February 11, 2013 order placing Child in a foster home. Mother stated the changed circumstance was that her friend (M.W.) had come forward and was willing to have Child placed in her care. Supported by a declaration from M.W., Mother stated M.W. was Mother's longtime friend; M.W. was willing to adopt Child; and placing Child in M.W.'s care would ensure that Child had contact with Mother if Child was adopted. M.W. stated she had spent time with Mother and Child when they would come to her home when Child was one year old; she had two children ages seven and 10; she had no Child Protective Services or criminal history; and she had been employed as a child development assistant for the school district since 2008.

2. *Trial Court's Finding of No Prima Facie Showing for Modification*

At a hearing on November 7, 2014, the court ruled that Mother had not made a prima facie showing to support her requests for modification, and accordingly denied Mother's modification petitions without holding a full evidentiary hearing. As to the request that Child be returned to Mother, the court stated the case involved serious domestic violence; Mother had a history of failing to disengage from R.H.; R.H. had previously been incarcerated and Mother maintained contact with him and was untruthful about this; and another "very lethal type" domestic violence incident occurred in March 2014 when R.H. was visiting at her home.

The court again recognized that it typically takes multiple occasions for someone to leave an abuser, but found that Mother had prolonged services and multiple opportunities to do so; she at times made progress but ultimately allowed R.H. to return to her life; R.H. would be released from prison in the future; and under these circumstances Mother's showing of 11 new therapy sessions and participation in a domestic violence group were not sufficient to show changed circumstances concerning Mother's ability to protect Child. The court stated it recognized that the prima facie showing was a "very low" threshold, but concluded the threshold had not "been crossed," finding that given Mother's history of "cycl[ing] back" to R.H. she had shown "not a changed circumstance, but at best a changing circumstance," and there was no prima facie showing that Mother had resolved the safety issues that made Child a dependent of the court. Also, the court stated Mother had not discussed Child's needs "at this point in

16

time," and concluded there was no prima facie showing that it was in Child's best interests to be raised by her biological mother if Mother can ensure her safety.

As to Mother's second motion, the court noted that at one point Child had been placed with a nonrelated extended family member at Mother's request, but this placement ended when the person had problems with Mother's "engagement or interference." In any event, the court stated that assuming the availability of Mother's friend was a changed circumstance, there was no prima facie showing that a change in placement would be in Child's best interest. The court stated the friend appeared to be competent to be a caregiver, but there was no evidence the friend had a relationship with Child or that Child would recognize her. Further, Child was currently in a stable, loving placement and the current caretaker was open to maintaining contact with Mother and with Second Child should Second Child return to Mother.

3. *Termination of Parental Rights*

Thereafter, at the permanency planning hearing on November 18, 2014, the court terminated Mother's parental rights and ordered that Child's permanent plan be adoption.

## DISCUSSION

Mother argues the trial court abused its discretion and violated her due process rights by summarily denying her section 388 modification motions without affording her a full evidentiary hearing.

### I. *Governing Law*

The dependency statutes are designed to balance numerous competing interests, including the interest in preserving a family unit, the parents' interest in the custody and

17

care of their children, and the child's interest in a stable, permanent relationship with a fully-committed caretaker. (*In re Zacharia D*. (1993) 6 Cal.4th 435, 446.) Under the statutory scheme, a parent's interest in reunification is given precedence over a child's need for stability and permanency up until the time reunification services are ordered terminated and the case is set for a section 366.26 permanency planning hearing. (*Id.* at p. 447.) Once parental " 'reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' " (*Ibid*.) " 'A court hearing a motion for change of placement at [the permanency planning] stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*In re J.C*. (2014) 226 Cal.App.4th 503, 527.)

As an " ' "escape mechanism" ' " to allow the court to consider new information even after termination of reunification services, a parent may file a motion for modification of the court's orders. (*In re Zacharia D., supra*, 6 Cal.4th at p. 447; § 388.) Section 388 allows a parent to file a modification petition based on "change of circumstances or new evidence" (§ 388, subd. (a)(1)) and instructs the court to hold a hearing "[i]f it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ." (§ 388, subd. (d)). To obtain modification, the parent has the burden to establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 806.) The section 388 petition should be liberally construed in favor of granting a hearing to consider the parent's request, and the parent need only make a prima facie showing of the required elements to trigger the right to proceed by way of a

18

full hearing.  (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309-310; *In re Zachary G., supra*, at p. 806.)

A prima facie showing " 'is one that is sufficient to support the position of the party in question.' " (*Kojababian v. Genuine Home Loans, Inc.* (2009) 174 Cal.App.4th 408, 417; *In re Zachary G., supra*, 77 Cal.App.4th at p. 806.)  The showing may consist of " 'slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.' " (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1172, fn. 14.)  To be entitled to a hearing, the petitioner need not establish a probability of prevailing, but need only present evidence that *might* warrant a change in the court's order.  (*In re Aljamie D*. (2000) 84 Cal.App.4th 424, 432-433; *In re Angel B*. (2002) 97 Cal.App.4th 454, 461.)  In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case.  (*In re Justice P*. (2004) 123 Cal.App.4th 181, 189.)  If the liberally construed allegations of the petition do not make a prima facie showing, the court need not order a full evidentiary hearing on the petition.  (*In re Zachary G., supra*, at p. 806.)

On appeal, we review the court's finding of no prima facie showing for abuse of discretion.  (*In re Brittany K*. (2005) 127 Cal.App.4th 1497, 1505.)  We must uphold the order unless the court's determination was arbitrary, capricious or patently absurd.  (*In re Mary G*. (2007) 151 Cal.App.4th 184, 205.)

## II. *Analysis*

The record supports the trial court's finding that Mother had not made a prima facie showing to require a full evidentiary hearing.  Regarding Mother's request that

Child be placed with her, Mother showed that in May 2014 she resumed participation in a domestic violence group and in July 2014 she started individual therapy with a different therapist, and her group facilitator and therapist assessed she was making progress and gaining insight that would assist her in staying away from R.H. and protecting her children from the dangers of domestic violence. Liberally construing this evidence to mean Mother was making substantial progress in therapy, this evidence cannot reasonably support a finding of a changed circumstance. The record is replete with information that Mother received therapeutic services, she claimed she understood the dynamics of domestic violence and was not seeing R.H., and her counselors reported she was making progress and gaining insight. Notwithstanding these services and indications she was staying away from R.H., Mother continued to maintain contact with him and to be untruthful about this, which culminated in the highly violent incident in March 2014.

For example, when Mother was at the domestic violence shelter starting in October 2012, she received services and stated she understood the cycles of domestic violence, and yet she continued to see R.H., which caused Child's removal in January 2013. When she was at the maternity shelter starting in February 2013, she initially participated in services, but then started spending time with R.H.'s family and stopped participating in the shelter services. During this same time period, she commenced individual therapy in March 2013 and joined a domestic violence group in May 2013 as part of her reunification plan for Child; she received favorable reports and claimed insight; and yet she continued her contact with R.H., even when he was in jail. She completed her domestic violence group program on February 26, 2014, and less than

20

three weeks later—when the March 17 domestic violence incident occurred that caused the Agency to recommend termination of services—it was discovered that she had resumed her relationship with R.H.

Also, the fact that R.H. was serving a four- to eight-year prison term at the time of Mother's modification motion does not show she would stay away from him when he was released. Given Mother's history of continually returning to R.H. notwithstanding extensive services, Mother's resumption of therapeutic services and R.H.'s incarceration cannot reasonably support a finding of a changed circumstance reflecting that Mother might now be ready to provide a safe home for Child.

Further, as noted by the trial court, Mother presented no evidence to support that it might be in Child's best interests to be removed from her caretaker and returned to Mother. At the time of the modification motion, Child had been removed from Mother's custody for almost two years; Child had been living with her current caretaker for about one and one-half years; she was three years old; she was bonded with the caretaker and viewed the caretaker (not Mother) as her mother; and the caretaker wanted to adopt her. The case was at the permanency planning stage which required the court to give paramount consideration to Child's need for permanency and stability, and Mother was still in the process of undergoing therapeutic services that in the recent past had been unsuccessful in separating her from her abuser.

For the same reasons, the record supports that there was no prima facie showing that it might be in Child's best interests to place Child with Mother's friend. There were no facts that could support a reasonable conclusion that Child's compelling need to stay

21

with the caretaker who she now viewed as her mother could be outweighed by a placement that might facilitate Child's ongoing contact with her biological mother who was not yet ready to reunify.

There was no abuse of discretion or violation of due process arising from the court's denial of a full evidentiary hearing concerning Mother's modification motions.

DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

22