Filed 9/11/15  In re C.R. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C.R., a Person Coming Under the Juvenile Court Law. | D067525 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14663) |
| v. | |
| R.P. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Judge.  Affirmed.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant R.P.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant D.M.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

R.P. (mother) appeals from the trial court's summary denial of her Welfare and Institutions Code[1] section 388 petition requesting that C.R. (minor) be moved from the home of a nonrelated extended family member (NREFM) and placed with a maternal aunt. Mother also appeals the court's denial of her motion to continue the contested section 366.26 hearing, which she made on day of the hearing, and from its refusal to apply the beneficial parent-child relationship exception to adoption.

Minor's father, D.M. (father), separately appeals from the court's refusal to apply the beneficial parent-child exception and from its order terminating parental rights. Affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

Minor was born in January 2010. In May 2011, father was arrested on drug charges. Father posted bail. About a month later, police stopped the car father was driving after father crossed over a double yellow line into oncoming traffic. During the stop, police detected a "strong order of marijuana" in the passenger compartment of the car. During a consent search, police found about one pound of marijuana in father's backpack, about 100 prescription pills and $1,972 in cash. Police next searched father's home, where among others mother and minor resided, and found an additional two pounds of marijuana and 500 more pills. The two pounds of marijuana were found to be

---

[1] All further statutory references are to the Welfare and Institutions Code unless noted otherwise.

2

easily accessible to minor. Father was arrested on drug charges, and mother was arrested and later cited for child endangerment.

According to mother, father was released from jail in January 2012. Upon his release, mother admitted to using methamphetamine with father. On June 7, 2012, with mother and minor in his car and while on probation, father was involved in a "road rage incident" with another driver. During the incident, father displayed what appeared to the other driver to be a "black handgun." Police responded, located a shoebox under a bush in front of father's stopped car and inside found a black BB gun that looked like a replica handgun, methamphetamine, marijuana and drug paraphernalia. Father was arrested on charges of child endangerment, possession and transportation of controlled substances and drug paraphernalia. Personnel from San Diego County Health and Human Services Agency (agency) responded to the arrest scene, took custody of minor and detained him in a foster home. That was the last time minor was under the care of either mother or father.

In connection with the agency's June 11, 2012 detention report, mother admitted smoking methamphetamine on June 6, 2012, the day before father's arrest. When asked why minor presumptively tested positive for methamphetamine, mother explained that while she was driving on June 5, 2012, father smoked methamphetamine while minor was in the car. Mother told an agency social worker she wanted father in minor's life but was nonetheless frustrated by father.

3

Father, who was released from custody, denied using drugs around minor. Father explained minor's presumptive positive test for methamphetamine by the fact that mother still breastfed minor and that "she uses." Father noted, "I'm sure she [i.e., mother] left that out." Father admitted using methamphetamine with mother three to five times per week and admitted at times they were under the influence of the drug while caring for minor, although father stated on those occasions they were " 'not out of [their] minds or anything.' "

The agency on June 11, 2012 filed a section 300, subdivision (b) petition on behalf of minor, alleging he was at substantial risk of suffering serious physical harm or illness as a result of (1) father's inability to supervise or protect minor adequately, stemming from the June 7, 2012 incident, and (2) both mother's and father's ongoing drug use. On June 12, 2012, the court sustained the agency's section 300 petition, declared minor a dependent and placed minor in out-of-home care.

The agency in its July 2, 2012 jurisdiction/disposition report recommended that minor remain in foster care; that mother and father both receive reunification services; and that they have liberal, supervised visits with minor. Mother and father were both interviewed in connection with that report. In one interview, mother stated she wanted minor placed with the maternal parents until she was able to reunify with minor. The July 2 report notes that a few days later, mother showed up 45 minutes late for an agency interview, which was rescheduled.

4

Mother again arrived late for the rescheduled agency interview. In addition, she brought to the interview a 17-year-old high school student and suggested the student was a "placement option" for minor because the student was in a " 'continuation school' " and thus was home and was able to watch minor during the day, while living at the student's mother's house. When asked if the student had a relationship with minor, mother responded, " 'Yeah, they have met a few times, but [minor] is really close to him.' "

Mother presented at the rescheduled interview as being anxious and unfocused. Mother admitted using marijuana and methamphetamine since she was 16 years old. She also stated she completed a drug diversion program when she was 20, but she relapsed when she met father.

At the next scheduled interview, the July 2 report noted mother again showed up 45 minutes late. Over the next few days, the agency left mother two detailed messages requesting a return call. Mother, however, did not call back. The report also noted mother often was late to in-person visits with minor and missed over six phone contacts with minor.

The July 2 report noted mother was accepted into the program at Serenity House on June 14, 2012, but she did not return as instructed. The administrator of the program gave mother a second chance to start the program, and mother returned on June 18, 2012. However, mother did not stay at the facility the following weekend, as required, and her drug test was positive for marijuana and alcohol. Mother also violated the rules of the

5

program by having a male guest stay overnight in her room. The administrator of the program referred mother to a detoxification program.

The July 2 report confirmed minor tested positive for methamphetamine at the time of his removal (i.e., June 7, 2012) from mother and father. Mother's June 8, 2012 drug test was positive for methamphetamine and marijuana.

According to the July 2 report, father began to use marijuana when he was 15 years old, and it was his drug of choice. Father admitted to being addicted to Oxycontin when he was arrested in June 2011, but he did not seek any drug treatment either during his eight-month incarceration or after his release in January 2012. Father stated he expected to be arrested soon for violating parole. Father also stated he wanted minor placed with the paternal grandfather. The paternal grandfather, however, told an agency social worker he was not then in a position to care for minor.

In its July 23, 2012 addendum report, the agency noted it had tried multiple times to contact mother. Mother on July 11, 2012 failed to show up for drug testing. On the few occasions mother responded to the multiple voicemail messages left by an agency social worker, mother stated she was attempting to enroll in a treatment program but did not say where or when she would be enrolling.

The July 23 addendum also included myriad examples of mother missing visits and/or being late in visits and/or phone calls with minor and of the multiple excuses she made as a result, including: her work schedule; her phone being broken; and her phone not being charged. The report noted mother admitted to lying about the reasons she was

6

unable to visit minor. The report also noted minor was losing interest as a result of his mother's inconsistent visits.

On July 23, 2012, the court made a true finding on the petition, declared minor a dependent and removed him from mother and father. The court placed minor in licensed foster care and ordered reunification services for mother and father.

In its January 23, 2013 status review report, the agency recommended termination of mother's services and the scheduling of a section 366.26 hearing. Minor then was thriving while living with J., a NREFM. Due to his incarceration, father was unable to receive any services.

The January 23 report noted mother up until recently had been living a transient lifestyle but had since moved in with her parents. Mother was accepted into an inpatient program on July 23, 2012, but she "again no showed." The program made another referral on August 14, 2012, and mother failed to follow through. Mother also failed multiple times to show up for appointments at the program and, when she met with the program coordinator in late September 2012, mother stated she wanted to participate only in an outpatient program. Mother also resisted the efforts of agency social workers and others to assist her in obtaining treatment in multiple other programs, including a detoxification program. Mother at the time was on a waiting list for an inpatient program. The report noted mother on multiple occasions, including in early January 2013, failed to show up for drug testing as requested by the agency. Mother also failed to participate in individual counseling despite two referrals by the agency.

7

The January 23 addendum also noted mother again, at least initially, was inconsistent both in her in-person and phone visits with minor, as she was often late or did not show up at all. When there were visits, that report noted they often went "fairly well" and that minor and mother both said they loved each other and were affectionate with each other. Minor then called mother his " 'momma.' "

At the time of the January 23 status review report, J., the NREFM, stated she did not want to adopt minor but was willing to provide him long-term care. The maternal grandparents were evaluated, but the agency discovered issues related to "criminal history, CPS history as well as the maternal grandparents having two children that reside in the home that ha[ve] molest history and substance abuse history." The contested section 366.21 hearing was set for March 11, 2013; the hearing was later continued to March 21, 2013.

In its March 11, 2013 addendum, the agency reported that mother's services at the visitation center were terminated because of missed visits; that mother showed up to an individual therapy session under the influence of a controlled substance; that mother was in denial of her addiction to drugs and instead blamed others for her circumstances; and that mother on February 26, 2013 was arrested for being under the influence of a controlled substance. The court at the March 21, 2013 contested hearing terminated the treatment plans of mother and father and set the matter for a section 366.26 hearing.[2]

_____

[2]     This court on July 1, 2013 denied the writ petition of father, joined by mother, claiming he was not provided with reasonable reunification services. (D063633.)

The agency in its July 18, 2013 section 366.26 report recommended termination of parental rights and a permanent plan of adoption for minor. It noted father had been released from prison on May 30, 2013 and was then enrolled in a six- to nine-month drug treatment program. Father participated in three supervised visits with minor from early June through early July 2013. At the end of each visit, minor separated easily from father.

On July 24, 2013, father filed a section 388 petition seeking to vacate the section 366.26 hearing, reinstate reunification services and begin unsupervised visits with minor. In support of his petition, father contended he participated in all services available while incarcerated and he entered a residential drug treatment program that he believed could be completed in as little as six months. Father also indicated he enrolled in parenting classes and was evaluated and found not to require mental health treatment services.

The agency opposed the petition. It noted that father had been in treatment for less than three months; that he had an extensive history of drug use spanning over a decade; that his treatment program usually required at least nine months; and that to date father had only attended one parenting class. Because of the fact minor had been removed in June 2012 and father was in the initial stage of treatment for his long-standing drug addiction, the agency concluded minor's need for stability of a permanent plan should not be jeopardized while the father received services, when it not only would take father time to complete the program but also to demonstrate that he could remain sober in a noncontrolled environment while holding down a job and parenting minor.

9

In its October 11, 2013 addendum report, the agency sought a continuance to access minor's paternal grandfather for guardianship. Minor's paternal grandfather reported he did not come forward earlier because he had a medical issue and because he wanted to give his son, father, the opportunity to reunify with minor. Minor's paternal grandfather believed that father was in the process of turning his life around and hoped one day father could petition the court and obtain custody of minor. Minor and the paternal grandfather had unsupervised visits that included an overnight visit.

In its October 11 report, the agency noted that mother waited until early September 2013 to schedule a visit with minor; that mother failed to show for the visit; and that a record check showed mother was then incarcerated on three outstanding warrants. A subsequent record check done by an agency social worker toward the end of September 2013 showed mother was no longer incarcerated, but at the time of the October 11 report she had yet to contact the agency, although mother did speak to minor on the telephone. When mother promised minor she would visit him and then did not follow through, it was reported minor was "disappointed."

Since the July 2013 section 366.26 report, an agency social worker observed 13 visits between minor and father. According to the October 11 addendum, the visits were positive, minor looked forward to them and was happy to see father. At the end of the visits, minor easily separated from father. That report further noted father then did not believe he was ready to be a full-time parent to minor and he was not sure when he would be ready to do so.

On October 11, 2013, the court granted father's section 388 petition, vacated the section 366.26 hearing and ordered reunification services for father. Minor was placed with the paternal grandfather in mid-November 2013. In its December 9, 2013 status review report in connection with a section 366.22 18-month/permanency review hearing, the agency recommended minor remain placed with the paternal grandfather while father continued to receive reunification services.

With respect to mother, the December 9 report noted the agency did not know her whereabouts, although mother called minor two or three times each week. As to father, that report noted he was visiting minor for a few hours each day at the paternal grandfather's home; he was drug free; he had signed up to participate in the program's outpatient aftercare program; and he was still participating in a residential substance abuse program, where he was on track to graduate in January 2014. The report also noted minor was doing "very well" in the paternal grandfather's home. The court at the December 9 hearing continued father's reunification services to the 24-month date.

The agency in its June 9, 2014 status review report recommended father's reunification services be terminated and minor remain placed in the paternal grandfather's home. With respect to father, the June 9 report noted that he tested positive for methamphetamine in April 2014, after father graduated from his treatment program; that he failed to perform drugs tests for the agency on three separate occasions in May 2014; and that he failed to contact the agency for nearly two weeks at the same time the agency was attempting (before it knew about his failed drug test) to arrange a trial placement of

11

minor. Father on May 20, 2014 admitted to an agency social worker he had relapsed and tested positive in April 2014 for methamphetamine and admitted he had used the drug the night before the interview. Father agreed to supervised contact with minor and to enroll in a recovery program.

At the time of the June 9 status report, mother had been incarcerated in April 2014 and again on May 20, 2014. Mother called minor on May 20 from the detention facility. Before this call, mother had not made telephone contact with minor for over two months and had failed to show up for a scheduled face-to-face visit with minor.

Father was accepted into drug court on June 11, 2014. He failed to attend hearings on June 25, July 2 and July 9, 2014, and was terminated as an "unsuccessful participant."

The agency on June 24, 2014 filed a section 387 petition on behalf of minor. In its June 25, 2014 detention report prepared in connection with the detention hearing/section 387 petition, the agency noted the paternal grandfather was allowing father to reside in the home with minor and provide unsupervised care of minor, despite the requirement father's visits be supervised as a result of his relapse. The June 25 report also noted that father's girlfriend was living in the paternal grandfather's home and providing care to minor and that there were ongoing instances of domestic violence between father and his girlfriend witnessed by minor, including one that took place on March 1, 2014 in which father was arrested. Father's girlfriend admitted she and father argued every day but said they " 'only [had] gotten physical like maybe like six or seven times.' "

12

The June 25 report described an incident in which an agency social worker made an unannounced visit to the paternal grandfather's home on June 20, 2014. Father was found hiding in the closet after father's girlfriend answered the door and let the social worker inside. The agency social worker confronted father with information learned from father's probation officer, which showed father had not been truthful with the agency regarding his living arrangements.

During the unannounced June 20 visit, the paternal grandfather arrived home with minor. The agency social worker heard minor crying and the paternal grandfather repeatedly telling minor, " '[G]et the hell out of the car, right now . . . come on get in the house, now!' " The social worker also witnessed the paternal grandfather throwing groceries and grabbing minor to get him inside the home. After being surprised by the social worker's presence in the home, the paternal grandfather admitted he knew about the domestic violence between father and his girlfriend; he knew minor had witnessed incidents of domestic violence while in the home; he knew father had relapsed; and he knew father was not allowed unsupervised visits with minor. The paternal grandfather admitted there was a " 'problem' " in his home but said, " 'I have to work and I have found it difficult to care for [minor] without some assistance.' "

Minor was removed and in an emergency placement was placed with his prior NREFM, J., who had cared for minor from November 2012 to November 2013 and who had since obtained her foster care license. The court at the June 25, 2014 detention hearing detained the child in out-of-home care.

13

At the July 25, 2014 contested 24-month subsequent permanency review hearing, the court terminated father's reunification services and found it would be detrimental to minor to return minor to either mother or father, both of whom were incarcerated at the time of the hearing. On September 8, 2014, the court made a true finding on the section 387 petition. The court scheduled the section 366.26 hearing for November 20, 2014.

The agency's November 10, 2014 section 366.26 report recommended that parental rights be terminated and that minor be freed for adoption. The report noted father had been arrested in September 2014 for violating a restraining order preventing him from entering the paternal grandfather's house. The paternal grandfather reported he had obtained the restraining order because father was violent when using drugs and was damaging the home and stealing from him. Father had not been in contact with the agency to request visits with minor since minor was removed from the paternal grandfather's house on June 20, 2014.

The November 10 report also noted minor was thriving in his current placement with J., who was very attached to minor, who wanted to adopt minor and who had a completed home study. To the extent J. was unable to adopt minor, the report noted there were 75 approved adoptive families in San Diego that would be willing to adopt minor. Minor, then aged four, verbalized he wanted to stay with J. forever, whom he now called " 'momma.' "

Since living with J., the November 10 report noted minor had not asked about or talked about father. The report concluded that there was no significant parental bond

14

between father and minor that would cause harm to minor if severed; that there was no parent-child bond between mother and minor; and that neither mother nor father met minor's needs or could be counted on to protect and care for minor. Because minor had been moved several times already and because he was attached to J. and looked to her as his parent, the report recommended minor be freed for adoption.

Before the contested section 366.26 hearing, mother filed a section 388 petition requesting minor be placed with a maternal aunt. The agency opposed the petition. In its opposition, the agency noted that mother had waited six *months* since minor was removed from the paternal grandfather's house to request minor be placed with the aunt; that the aunt had not maintained contact with minor; that the aunt did not visit with minor; that the aunt did not call minor; that the aunt had never called to inquire about minor's health or well-being, despite the fact minor needed surgery for a congenital heart defect; and that the aunt had never contacted the agency to inquire about minor or the status of his case. In short, because the maternal aunt had no relationship with minor and because the minor was thriving in his placement with J., the agency recommended minor remain with J.

The court continued the hearing on mother's section 388 petition to coincide with the hearing on the contested section 366.26 petition. The agency in its February 5, 2015 addendum report prepared in connection with the section 366.26 hearing noted mother began weekly visits with minor in November 2014 and her last visit with minor was in mid-January 2015, when mother was arrested for a parole violation. Although those

visits went well, the report noted mother was inconsistent in demonstrating a "parental role," in "responding appropriately to [minor's] verbal/non-verbal signals," and in putting minor's "needs ahead of her own."

As to father, the agency noted he contacted the agency once in mid-November 2014 to schedule a visit but since then had been out of contact with the agency. At the time of the contested section 366 hearing, father was incarcerated.

At the outset of the February 5, 2015 contested hearing, mother's counsel stated that earlier that day mother informed counsel she wanted to retain private counsel and wanted the hearing continued. In denying the continuance, the court noted that the contested hearing had been pending for at least six to eight weeks;[3] that mother had not officially retained a new attorney; and that given minor's young age and his need to determine permanency, it was not in minor's best interest to grant the continuance.

With respect to mother's request for an evidentiary hearing in connection with her section 388 petition, the court found that mother did not make a prima facie showing of new evidence or changed circumstances or a showing that the requested change in the court order would serve minor's best interest. After recounting minor's many placements and the multiple hearings in this case, the court noted mother throughout this time had been represented by counsel and "had an opportunity at all of the hearings to make her wish known to the court regarding placement. The maternal aunt's home was approved,

---

3       According to the record, the contested section 366.26 hearing had actually been set for 11 weeks.

and it appears it was a fact that she no contact with [minor]. And that is very important because that would evidence her desire to be available for the child."

Next, the court in connection with the section 366.26 hearing admitted the agency's reports, summarized *ante*. Mother testified that she took care of minor for two and one-half years; that when they visited, minor called her "mom" and told her at the end of the visits, " 'Why can't I go with you, mom?' "; and that the court should not terminate parental rights because the bond between them was "not broken."

After considering the evidence and listening to the argument of counsel, the court found by clear and convincing evidence that minor was likely to be adopted. The court found that minor had an established relationship with his current caretaker; that minor wanted to live permanently with his current caretaker and the caretaker's other foster child, whom minor referred to as his sister; that minor had been through multiple placements already; that minor was very intelligent and thus was able to express where he wanted to live; that the current caregiver wanted to adopt minor and had a completed home evaluation for adoption; and that if the current caregiver for whatever reason was unable to adopt minor, there were 75 additional approved prospective adoptive homes that would be willing to adopt a child with minor's characteristics.

The court also found that termination of parental rights of mother and father would not be detrimental to minor pursuant to any of the exceptions; that while there were periods when mother and father (allegedly, as discussed *post*) had consistent visits with minor, it was not in minor's best interest to promote or facilitate either a mother-child or

17

father-child relationship; and that mother and father had succumbed to a "lot of other life issues . . . that [have] subordinated their ability to be there consistently on a day-to-day basis for their son."

The court further found that whatever benefit may have been conferred upon minor by the contact with mother and/or father was "greatly outweighed by his need for stability in placement, which can only be achieved through adoptive placement." The court thus terminated the parental rights of mother and father.

After its ruling, the court asked minor's court appointed special advocate (CASA) if she had any comments to make to the court. The CASA noted that while minor loved his parents, minor was "very happy in his placement and he loves his foster family." The CASA further noted it would be "detrimental" to take minor away from that environment and thus concluded the court's ruling was the "right thing to do for the child." At the conclusion of the hearing, the court designated J., minor's current caregiver, as a prospective adoptive parent within the meaning of section 366.26, subdivision (n).

### DISCUSSION

A. *Denial of section 388 petition*

Mother contends the court abused its discretion and violated her due process rights when it denied without a full evidentiary hearing her section 388 petition seeking a change in minor's placement from J. to the maternal aunt. We disagree.

The dependency statutes balance numerous competing interests, including the interest in preserving a family unit; the parents' interest in the custody and care of their

18

child; and the child's interest in a stable, permanent relationship with a fully-committed caretaker.  (*In re Zacharia D.* (1993) 6 Cal.4th 435, 446.)  Under the statutory scheme, our Legislature has given a parent's interest in reunification precedence over a child's need for stability and permanency up until the time reunification services are terminated and the case is set for a section 366.26 permanency planning hearing.  (*Id.* at p. 447.)  Once parental " 'reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' "  (*Ibid.*)  " 'A court hearing a motion for change of placement at [the permanency planning] stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' "  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

As an " ' "escape mechanism" ' " to allow the court to consider new information even after termination of reunification services, a parent may file a section 388 petition for modification of a court order.  (*In re Zacharia D.*, *supra*, 6 Cal.4th at p. 447; § 388.) Section 388 allows a parent to file a modification petition based on "change of circumstances or new evidence" (§ 388, subd. (a)(1)) and instructs the court to hold a hearing "[*i*]*f* it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . ."  (§ 388, subd. (d), italics added; see *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)  The section 388 petition should be liberally construed in favor of granting a hearing to consider the parent's request, and the parent need only make a prima facie showing of the required elements to trigger the right to proceed by

way of a full hearing. (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309–310; *In re Zachary G.*, *supra*, at p. 806.)

A prima facie showing " 'is one that is sufficient to support the position of the party in question.' " (*Kojababian v. Genuine Home Loans, Inc*. (2009) 174 Cal.App.4th 408, 417; *In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.) The showing may consist of " 'slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.' " (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1172, fn. 14.) To be entitled to a hearing, the petitioner need not establish a probability of prevailing, but need only present evidence that *might* warrant a change in the court's order. (*In re Aljamie D*. (2000) 84 Cal.App.4th 424, 432–433; *In re Angel B*. (2002) 97 Cal.App.4th 454, 461.) In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P*. (2004) 123 Cal.App.4th 181, 189.) If the liberally-construed allegations of the petition do not make a prima facie showing, the court need not order a full evidentiary hearing on the petition. (*In re Zachary G., supra,* at p. 806.)

We review the court's finding of no prima facie showing for abuse of discretion. (*In re Brittany K*. (2005) 127 Cal.App.4th 1497, 1505.) We must uphold the order unless the court's determination was arbitrary, capricious or patently absurd. (*In re Mary G*. (2007) 151 Cal.App.4th 184, 205.)

Here, we conclude mother failed to satisfy her burden to show the court erred in finding there was no prima facie showing of new evidence or changed circumstances in

connection with her petition, given that she waited six *months* after minor was removed from the paternal grandfather's house to seek relief. In addition, we separately conclude mother failed to make a prima facie showing that granting her section 388 petition and placing minor with the maternal aunt was in minor's best interest. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [noting the primary consideration in determining the best interests of a child is the goal of assuring stability and continuity]; see also *In re Angel B.*, *supra*, 97 Cal.App.4th at p. 464 [noting that when "custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role," and noting that "need often will dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child"].)

Indeed, on the one hand the record shows that, at the time of the section 388 petition, minor had no relationship whatsoever with the maternal aunt or his cousins. The maternal aunt's last visit with minor was July 2012, about a month after minor was detained. At the time mother filed her section 388 petition in late December 2014 and when that petition was denied in early February 2015, more than two *years* had passed since the maternal aunt last visited minor. During this period of time, the maternal aunt also did not call to speak with minor, even when minor was living with the paternal grandfather; she did not inquire about minor's health or well-being, even after the minor had surgery to repair a congenital heart defect; and she did not contact the agency to inquire about minor or the status of his case in connection with minor's well-being or his placement.

21

In addition, we note when minor was first removed mother wanted minor placed with the maternal grandparents, but that placement was not approved because on evaluation there were issues related to "criminal history, CPS history as well as the maternal grandparents having two children that reside in the home that ha[ve] molest history and substance abuse history." The record shows mother next suggested that a 17-year-old high school student, who was in continuation school and thus at home during the day, was a suitable placement option for minor because the student and minor had met a "few times." Thus, the record strongly suggests mother's desire regarding the placement of minor was not always in minor's best interest.

On other hand, the record clearly shows that at the time of the section 388 petition, minor was thriving in his NREFM placement with J., where minor had spent more than one and a half years in J.'s care. Minor was then referring to J. as "momma," looked to her as a parent and considered J.'s other foster child as his sister. In addition, minor—who repeatedly is described as being extremely intelligent and verbal for his age—told an agency social worker that he did not want to leave J.'s home. The record also shows J. wanted to adopt minor and had an approved adoptive home study.

In light of minor's multiple placements over the course of his young life, his need for stability and continuity, and his strong bond to and relationship with J. over the course of more than a year and a half *and* his lack of *any* relationship whatsoever with the maternal aunt, we conclude the court properly exercised its discretion when it found without a full-blown evidentiary hearing that mother did not make a prima facie showing

22

that the requested change in the court order placing minor with the maternal aunt was in minor's best interest. (See *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [upholding the decision of the court made shortly before a section 366.26 hearing to deny a mother's section 388 petition seeking a change of placement of her child from a foster family to the mother's cousin and his wife because the cousin had only met the child once and because the child had lived with her foster family for half of her life, had a strong bond to them and they had indicated their desire to provide the child a permanent home].)

We thus conclude there was no abuse of discretion or violation of due process arising from the court's denial of a full evidentiary hearing concerning mother's section 388 petition for a change in placement.

B. *Beneficial parental relationship*

Mother and father separately contend there is insufficient evidence to support the court's finding that neither met their burden of showing a beneficial relationship with minor for purposes of the beneficial parent-child relationship exception to adoption set forth in section 366.26, subdivision (c)(1)(B)(i).

When reunification services are terminated, such as in the instant case, the focus of a dependency proceeding shifts from preserving the family to promoting the best interest of the child, including the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) At the section 366.26 selection and implementation hearing, the court has three options: (1) terminate parental rights and

23

order adoption as the permanent plan, (2) appoint a legal guardian for the dependent child, or (3) order the child placed in long-term foster care. (*Ibid.*)

However, "[a]doption . . . is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) Thus, "[i]f the child is adoptable, there is a strong preference for adoption over alternative permanency plans." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 588.) All that is required to show a dependent child is adoptable is "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406; see § 366.26, subd. (c)(1).)

Here, as noted, the court at the section 366.26 hearing found minor was likely to be adopted, which finding neither mother nor father challenge on appeal. Indeed, the record shows J. wanted to adopt minor and that if J. was unable to do so, there were at least 75 other families that wanted to adopt a child with the characteristics of minor. Once the court found by clear and convincing evidence that minor was likely to be adopted within a reasonable time, it was required to terminate the parental rights of the parents and select adoption as the permanent plan unless mother and/or father showed that termination of parental rights would be detrimental to minor, including, as each contends here, under the beneficial parent-child relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i). (See *In re Michael G.*, *supra,* 203 Cal.App.4th at p. 589; *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.)

24

Section 366.26, subdivision (c)(1)(B)(i) provides an exception to the adoption preference if the court finds a "compelling reason" for determining that termination of parental rights would be "detrimental" to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The statutory phrase "benefit from continuing the relationship" has been interpreted to mean that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

In determining whether the child would benefit from continuing the parent-child relationship for purposes of this exception, the court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; accord, *In re Jason J.* (2009) 175 Cal.App.4th 922, 936.)

To meet his or her burden of establishing the applicability of the beneficial parent-child relationship exception, a parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) "Interaction between natural parent and child will always confer

some incidental benefit to the child." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Rather, the "parent must show he or she occupies a parental role in the child's life." (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re Derek W.*, *supra*, at p. 827.)

Thus, a "biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 466, italics omitted; accord, *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643.)

On review of the sufficiency of the evidence to support a court's order terminating parental rights and freeing the parent's child for adoption, "we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) "We must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)[4]

---

[4]   The agency urges us to adopt a hybrid standard of review, applying both the substantial evidence and abuse of discretion standards, as some courts have done. (See, e.g., *In re J.C.* (2014) 226 Cal.App.4th 503; *In re Bailey J.* (2010) 189 Cal.App.4th 1308.) We note there is little practical difference between the two standards. (See *In re*

"The appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

Here, although we doubt the court's finding that mother and father each "maintained regular visitation and contact with the child" is supported by substantial evidence in the record,[5] we need not base our decision on that issue because we conclude mother and father have each failed to show no substantial evidence supported the finding that the beneficial parent-child exception did not apply to each of them in this case.

---

*Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [recognizing the "practical differences between the two standards of review are not significant"].) In any event, we need not decide whether to apply the hybrid standard here because we note, as does the agency, that the result would be the same regardless of whether we apply a hybrid or substantial evidence standard in this case.

[5] The record shows at the February 5, 2015 section 366.26 hearing, the court noted this case was originally in another department and thus the court, while familiar with the case and its issues, had not been involved in the case from its beginning. In any event, the record suggests both mother's and father's visits with minor were sporadic and inconsistent after minor was detained in June 2012. (See *In re C.F.*, *supra,* 193 Cal.App.4th at p. 554 [noting that "[s]poradic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].) By way of example only, mother had no contact whatsoever with minor from June 20, 2014, when minor was hastily removed from the paternal grandfather's house, until November 12, 2014. Mother's resumed visits with minor in November 2014 ended in mid-January 2015, after mother was arrested and incarcerated (yet again). The record also shows mother often was late and/or missed visits and often made excuses when she did so. As for father, after minor was removed from the paternal grandfather's house in June 2014, father had no further contact with minor. By the time of the contested section 366.26 hearing, father had not seen minor in seven *months*.

As for mother, while the record shows she had positive interactions with minor during their visits and clearly loved minor, the record also shows at no time since minor was detained in June 2012 did mother occupy a "parental role" in the child's life. (See *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109.) Rather, the record shows mother had an on-again, off-again relationship with minor, as evidenced by her lack of any contact with minor from June 2014 until November 2014 and as evidenced by her brief, unscheduled visit with minor on Christmas Eve 2013, which was mother's only in-person visit with minor over a six-month period.

The record also shows mother often was late for visits and/or missed visits with minor, often making excuses for doing so. At the same time, mother was continually struggling to stay sober and was arrested and incarcerated multiple times after minor was removed from her care in June 2012, including at or near the time of the February 5, 2015 section 366.26 hearing. Moreover, at the time of the section 366.26 hearing, minor had not lived with mother since June 2012, when minor was about two and half years old. At the time of the hearing, minor was five years old. Thus, for almost half his young life, minor had not lived with mother.

In contrast, the record shows at the time of the section 366.26 hearing minor had lived with J. for more than a year and a half; that minor looked to J. as a parental figure; that J. took care of minor's daily needs, including his medical needs; that minor called J. "momma" and J.'s other foster child, sister; that minor expressed his desire to always live

28

with J.; and that minor was thriving in his placement with J., who also wanted to adopt minor.

Thus, when balancing the "strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) in light of the circumstances of this case, we conclude the record amply supports the finding that with respect to mother, the beneficial parent-child exception did not apply in this case. (See *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424 [noting the parental relationship must be more than " 'frequent and loving contact' " for the exception to adoption to apply].)

We reach the same conclusion with respect to father. Although father at one point appeared to occupy somewhat of a parental role with minor after minor was placed with the paternal grandfather in November 2013, the record also shows that like mother, father was unable to remain sober and care for minor for any length of time, even when a future with minor was at stake; that father exposed minor to domestic violence, including physical acts of violence, at least six or seven times when minor was living in the paternal grandfather's home; that after minor was hastily removed from the paternal grandfather's home in June 2014, father had *no* visits with minor at the time of the February 5, 2015 section 366.26 hearing; and that at or near the time of the section 366.26 hearing, like mother, father was once again incarcerated.

Again, when balancing the "strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new

29

family would confer" (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) under the circumstances of this case, we conclude with respect to father that the record supports the finding that the beneficial parent-child exception did not apply in this case.  (See *ibid.* [noting the statutory phrase " 'benefit from continuing the [parent/child] relationship' " means that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents"].)

C.  *Motion for Continuance*

Lastly, mother contends the court abused its discretion and thus erred when it denied her oral motion for a continuance to obtain private counsel, which she made at the outset of the February 5, 2015 section 366.26 hearing.  We disagree.

Section 352, subdivision (a) provides a continuance shall be granted only on a showing of good cause and when it is the best interest of the child.[6]  In considering the

---

6  Subdivision (a) of section 352 provides: "Upon request of counsel for the parent, guardian, minor, or petitioner, the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor.  In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.  [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance.  Neither a stipulation between counsel nor the convenience of the parties is in and of itself a good cause.  Further, neither a pending criminal prosecution nor family law matter shall be considered in and of itself as good cause.  Whenever any continuance is granted, the facts proven which require the continuance shall be entered upon the minutes of the court.  [¶]  In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts

30

child's interests, the court is required to "give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."  (*Ibid.*)

Here, the record shows mother was present at the November 20, 2014 hearing when the court set the February 5, 2015 section 366.26 hearing.  The record does not show why mother waited until the day of the section 366.26 hearing, *months* after receiving notice of it, to seek new counsel and/or why new counsel was necessary or, in light of the circumstances of this case, how new counsel would have made any difference in this case.

What's more, mother also did not explain or provide any detail at the section 366.26 hearing regarding how long of a continuance she wanted.  Although on appeal she claims she merely wanted a "brief delay," as is evident from the circumstances of, and the voluminous record in, this case, it is unlikely new counsel would have been ready to proceed with merely a "brief delay" in the hearing.

In addition, the record shows the February 5, 2015 section 366.26 hearing was the second time such a hearing had been set, as the court in July 2013 had initially scheduled the section 366.26 hearing for mid-September 2013.  The September 2013 hearing was vacated, however, after the court granted father's section 388 petition.

Considering that minor had been detained since June 2012, that the section 366.26 hearing already had been vacated about a year and a half before it actually took place,

showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance."

31

and that mother had notice of the February 5, 2015 section 366.26 hearing as early as November 20, 2014, we conclude the court properly exercised its discretion when it found a continuance of that hearing was not in minor's best interests. (See § 352, subd. (a); *In re Gerald J.* (1991) 1 Cal.App.4th 1180, 1187 [noting " '[t]ime is of the essence in offering permanent planning for dependent children' " and noting a "reviewing court will reverse an order denying a continuance only upon a showing of an abuse of discretion"]; see also *In re David H.* (2008) 165 Cal.App.4th 1626, 1635 [noting "[c]ontinuances in juvenile dependency proceedings are disfavored"].)

DISPOSITION

The order terminating the parental rights of mother and father and finding minor adoptable is affirmed.

BENKE, Acting P. J.

WE CONCUR:

HALLER, J.

PRAGER, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32